## Moalem Weitemeyer

Moalem Weitemeyer
Advokatpartnerselskab
Amaliegade 3
DK-1256 Copenhagen

Tel.   +45 7070 1505
moalemweitemeyer.com

CVR   3162 7885

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

In re

CUSTOMS AND TAX ADMINISTRATION OF THE
KINGDOM OF DENMARK (SKATTEFORVALT-
NINGEN) TAX REFUND SCHEME LITIGATION

This document relates to case nos.:

18-cv-07828; 19-cv-01785; 19-cv-01867; 19-cv-01893;
19-cv-01781; 19-cv-01783; 19-cv-01866; 19-cv-01895;
19-cv-01794; 19-cv-01865; 19-cv-01904; 19-cv-01798;
19-cv-01869; 19-cv-01922; 19-cv-01800; 19-cv-01788;
19-cv-01870; 18-cv-07827; 19-cv-01791; 19-cv-01792;
19-cv-01928; 19-cv-01926; 19-cv-01868; 18-cv-07824;
19-cv-01929; 19-cv-01803; 19-cv-01806; 19-cv-01906;
19-cv-01801; 19-cv-01894; 19-cv-01808; 19-cv-01810;
19-cv-01809; 18-cv-04833; 19-cv-01911; 19-cv-01898;
19-cv-01812; 19-cv-01896; 19-cv-01871; 19-cv-01813;
19-cv-01930; 18-cv-07829; 18-cv-04434; 19-cv-01815;
19-cv-01818; 19-cv-01931; 19-cv-01918; 19-cv-01873;
19-cv-01924; 19-cv-10713; 21-cv-05339.

Master Docket 18-md-02865 (LAK)
 ECF Case

**DECLARATION OF FOREIGN LAW OF HENNING AASMUL-OLSEN**

**June 24, 2024**

# Moalem Weitemeyer

| Report of | : | Mr. Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

## Contents

I.     Introduction .................................................................................................................. 3

II.    Shares Of A Publicly Traded Company ........................................................................ 4

     A.      Shares ................................................................................................................. 4

     B.      Holding Dematerialised Shares ....................................................................... 7

III.    Ownership Of Publicly Traded Shares ......................................................................... 8

     A.      The Construct Of Ownership ........................................................................... 8

     B.      Conditions For Ownership – Segregation ..................................................... 10

     C.      Conditions For Ownership – Settlement (Delivery) ..................................... 16

     D.      The "Nemo Dat Quod Non Habet" Doctrine ................................................ 18

     E.      The "nemo dat quod non habet" doctrine applies to dividends ................... 22

     F.      The Term "Beneficial Ownership" ................................................................ 23

IV.    Short selling ............................................................................................................... 24

V.    Recent Danish Decisions ........................................................................................... 25

     A.      The Bech-Bruun Decision ............................................................................. 25

     B.      Cases before the Danish Tax Tribunal ......................................................... 26

## Appendices

**Appendix 1**      Curriculum vitae of Mr. Henning Aasmul-Olsen

**Appendix 2**      Glossary

**Appendix 3**      Rules and regulations, literature and other materials considered

**Appendix 4**      Timeline for dividend distribution based on T+2 and T+3 settlement

**Appendix 5**      Cases referenced by Mr. Pilgaard

**Appendix 6**      Collection of statements by legal commentators on segregation as a condition for ownership

| M Moalem Weitemeyer | Report of | : | Mr. Henning Aasmul-Olsen |
|---|---|---|---|
| | Specialist field | : | Danish Law |
| | Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| | Prepared for | : | United States District Court, Southern District of New York |

## I.    Introduction

1.      My full name is Henning Aasmul-Olsen. I have written this declaration (the "**Declaration**") at the request of Hughes Hubbard & Reed LLP on behalf of the Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) (the "**Plaintiff**" or "**SKAT**"), to be submitted to the United States District Court for the Southern District of New York in the United States of America (the "**Court**") in the case no. 18-md-2865 (LAK) (the "**Dispute**").

2.      I am broadly trained and experienced in Danish law with specialist expertise in Danish securities laws, including corporate laws, and an LL.M. degree from University of Michigan. I am a partner with Moalem Weitemeyer Advokatpartnerselskab, a Danish law firm focused on transactional work and dispute resolution[1]. I am head of the firm's Capital Markets practise. I have previously worked as an investment banker with Danske Bank, the largest bank in Denmark, as executive director and co-head of the bank's corporate finance unit in Copenhagen. I have advised on multiple capital markets and public M&A transactions as legal counsel or financial adviser. I am admitted to the Danish Bar with the privilege of audience in the Danish Supreme Court. My Curriculum Vitae is attached as Appendix 1.

3.      I have acted as expert in Danish securities laws on behalf of SKAT and given evidence to The High Court of Justice Business and Property Courts of England and Wales King's Bench Division Commercial Court in the consolidated Claims: CL-2018-000297, CL-2018-000404, CL-2018-000590, CL-2019-000487 and CL-2020-000369 in litigation that presented similar issues to the issues before the Court. After trial, judgement on matters of Danish law was passed by the English High Court on March 24, 2023, accepting my evidence on all points.

4.      On June 6, 2022, I prepared a declaration for submission to the Court. I have prepared this Declaration to update my June 2022 submission for subsequent events and offer opinions on certain views of Kasper Pilgaard expressed in a reply declaration dated June 27, 2022 ("**Pilgaard Decl. II**"). This Declaration supersedes and replaces my 2022 submission.

---

[1] I am scheduled to retire as partner from Moalem Weitemeyer Advokatpartnerselskab on June 30, 2024.

| Report of | : | Mr. Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

5.      The opinions rendered herein are opinions on legal matters and not on facts. The opinions expressed by me are opinions on civil law, and I do not express opinions on tax laws unless expressly set forth. I am entitled to render such opinions and qualified to do so on the basis of my knowledge of Danish law.

6.      My compensation for rendering this Declaration has been agreed on a per-hour fee basis. My compensation does not depend in any way on the opinions I have rendered.

7.      I have based my opinions exclusively on official rules and documents and certain facts, of which I have been informed by the Plaintiff.

8.      A "**Paragraph**" refers to a paragraph of this Declaration and an "**Exhibit**" and an "**Appendix**" refers to an exhibit and an appendix to this Declaration, respectively, unless otherwise stated or the context requires otherwise. A glossary is set out in Appendix 2.

9.      The Danish regulations and rules, practice, literature, and material submitted in the Dispute, which I have reviewed for the purpose of this Declaration, are set out in Appendix 3.

## II.    Shares Of A Publicly Traded Company

### A.    Shares

10.      In Danish law, "a share" is a company law construct. A "share" is defined[2] as a notional relative stake in the capital of a limited liability company. This construct is key to the very notion of a limited liability company and "shareholder rights", i.e. rights which derive from the acquisition and holding of shares.

11.      Fundamentally, a share in a Danish company is the asset owned by a shareholder[3]. In Danish property law, ownership provides a person the right to possess and use, and the right to contract over, any given asset, subject in all events to restrictions imposed by law[4]. For ownership to a share, this implies the right to exercise the shareholder rights, governance rights and financial rights, in the

---

[2] In Section 5, item 14, of the Danish Companies Act (by reference to Sections 45 through 49 of the same Act).
[3] Section 5, no. 16, of the Danish Companies Act, see Exhibit 11, and Appendix 1 , Definitions, General, No 6, of the Danish Financial Statements Act, see Exhibit 12.
[4] Peter Mortensen: *Indledning til tingsretten*, page 61 onwards, see Exhibit 13, and Michael Elmer og Lise Skovby: Ejendomsretten, 1999, page 13, see Exhibit 14.

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

company available to shareholders under its articles of association and the Danish Companies Act and the right to sell, pledge and contract in every respect over such share[5]. The shareholder rights include governance rights such as, e.g., the right to attend, speak and vote at general meetings, and financial rights, such as, e.g., the right to receive dividends and proceeds upon liquidation. All of these share-holder rights are directly enforceable against the issuer under law and would affect not only the issuer but the rights of all other shareholders as well. Consequently, two persons trading "a share" must be trading a share that is recognized by the Issuer and the other shareholders as existing.

12.    All Danish businesses with shares admitted to public trading and official listing are limited liability companies. A company with limited liability must have a fixed share capital (denominated in DKK or Euro or any other permitted currency from time to time)[6]. The share capital cannot be floating or a minimum[7].

13.    Danish companies must stipulate the aggregate nominal share capital and either the number of shares or the nominal value of each share in the articles of association[8]. The information is registered by the Danish Business Authority and publicly available[9].

14.    As a matter of Danish law, it is not possible for a company to be held to have issued more shares than the number registered by the Danish Business Authority, as this would imply non-compliance with several fundamental corporate law requirements such as:

- The requirement for the share capital and number of shares to be adopted by the general meeting (or the board of directors) of the company[10];

- The requirement for any share to be subscribed in writing[11]; and

---

[5] Jakob Bundgaard: Skatteret & Civilret, 2006, pages 918-922, see Exhibit 15.

[6] Section 4 of the Danish Companies Act, see Exhibit 11. See also Sorensen Dep. Vol II 12:17-13:13 confirming that the amount of shares issued by a company will be a fixed amount in VP Securities' systems.

[7] See section 15, subsection 1, item 5 of the Danish Executive Order on Registrations, which provides the following when incorporating a limited liability company: *"Registration via the Danish Business Authority's self-registration solution on www.virk.dk for companies etc. or filing for registration of incorporation of a limited liability company shall at a minimum include the following: [...] (5) the amount of the share capital and the method of payment, the amount of the paid in share capital if only part of the share capital or the premium has been paid in, cf. the Danish Companies Act section 40, subsection 2, and the size of any potential premium"*, Lars Bunch et al.: *Selskabsloven med kommentarer* (*En.* The Danish Companies Act with comments), 3rd edition, 2018, page 95, Exhibit 16, and Bernhard Gomard et al.: *Kapitalselskaber* (*En.* Limited liability companies), 8th edition, 2015, pages 130-131, Exhibit 17.

[8] The Danish Companies Act, section 28, item 3, see Exhibit 11.

[9] Now at https://datacvr.virk.dk/data/.

[10] Sections 154 - 155 of the Danish Companies Act, see Exhibit 11.

[11] Section 163 of the Danish Companies Act, see Exhibit 11.

**Moalem Weitemeyer**

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

- The requirement that all shares have been fully paid in or at least paid in by 25 per cent (plus the full premium) into the company[12].

15.     Moreover, if a company could be held to have issued more shares than the number registered by the Danish Business Authority, market uncertainty would be created in respect of the size of offer and demand available, total voting rights, total dividend rights, and the basis for per share derived financial metrics (e.g., earnings per share), all of which could lead to additional non-compliance with law, including violations of disclosure obligations.

16.     Upon adoption of the relevant corporate resolutions and registration with the Danish Business Authority, shares of publicly traded Danish companies will be issued in the systems of VP Securities[13]. In fact, publicly traded companies will provide in their respective articles of association that *all* shares of the same class are or shall be issued through VP Securities (or, generally, a central securities depository, a "**CSD**")[14]. As correctly stated in Pilgaard Decl. I ¶ 149 the "book-entry" representing the issuance of shares by a Danish company refers to a book-entry in the systems of VP Securities, not a book-entry by a custodian of a purchaser.

17.     Accordingly, for shares issued in dematerialised form at VP Securities, at any given time, the total share capital and the total number of shares in any given share class will be registered by the Danish Business Authority and will match (a) the total share capital and the total number of shares created in the systems operated by VP Securities, and (b) if the shares are admitted to trading and official listing on Nasdaq Copenhagen, the total share capital and the total number of shares so admitted to trading and listing at Nasdaq Copenhagen[15]. No additional shares can be created anywhere without several corporate formalities at the initiative of the issuer (who will be compelled to grant shareholder rights enforceable by law by virtue of a shareholding), a registration by the Danish Business Authority and an issuance by VP Securities.

---

[12] Sections 33 and 158 of the Danish Companies Act, see Exhibit 11.

[13] VP securities recently changed its name to Euronext Securities Copenhagen. In this Declaration, I will continue to refer to "VP Securities" which was the name used during the relevant period for the case considered by the Court. VP Securities is currently the only CSD with a Danish license and was the only Danish licensed CSD in the Relevant Period. For the Relevant Period, and having investigated multiple Danish companies, I believe that all Danish companies with primary Nasdaq Copenhagen listings chose VP Securities as CSD in the Relevant Period.

[14] See, for example, Article 4.1, last sentence, of Novo Nordisk A/S' articles of association as amended latest on 27 April 2022, Exhibit 18.

[15] See Sorensen Dep. Vol II 11:12-14:25 and 24:8-25:5.

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

18.     The implication is that ownership of any share in a Danish company will refer to ownership of a share existing as book-entry in the systems of VP Securities, and it will moreover always refer to a share allocated to a specific account in the name of an "**Account Holding Institution**"[16] (sometimes being the end-investor and sometimes not) for an account in the systems of VP Securities[17]. A share issued in the systems of VP Securities will never leave such systems, not even if purchased by a non-Danish owner.

19.     Consequently, as a result of the facts and law set out in Paragraphs 12-18, two persons trading "a share" cannot by virtue of such trading create a share that has not been issued by a company and recorded in the systems of VP Securities.

**B.     Holding Dematerialised Shares**

20.     The fact that all shares of a publicly traded company will be issued in the systems of VP, and all allocated to accounts in VP Securities, does not mean that dematerialised shares can only be held by persons registered in VP Securities. From a Danish law point of view, the person registered with VP Securities is not necessarily the ultimate owner of the shares. Shares can indeed be held by end-investors in a chain of custody down-stream from VP Securities.

21.     Since ownership to shares in any event requires the existence of such shares, and all shares are allocated to accounts in VP Securities, a share held in a chain of custodians downstream from VP Securities will, at any given time, originate from shares in an account in VP Securities allocated to an Account Holding Institution.  For a purported downstream shareholder to establish that it owns a share, it must demonstrate upstream ownership at VP Securities, and then identify the recorded holding in every downstream custody level in such chain until it reaches its sub-custodian. For the conditions for ownership of shares, see Paragraphs 25 - 66.

---

[16] An "**Account Holding Institution**" is a Danish or foreign financial institution entitled and obliged to report for book-entry in the systems of VP Securities, see Sections 62 and 66 of the Danish Securities Trading Act, Exhibit 1.

[17] Except for certain shares temporarily unclaimed pursuant to Section 63 of the Danish Companies Act, Exhibit 11, and placed credited to a special VP account (bonus shares and residual shares from a replacement of certificated shares with dematerialised shares), Danish law does not permit shares of a publicly traded company to be unallocated in the systems of VP.

| Moalem Weitemeyer | Report of | : | Mr. Henning Aasmul-Olsen |
| | Specialist field | : | Danish Law |
| | Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| | Prepared for | : | United States District Court, Southern District of New York |

22.    This is explicitly recognised in Section 72, subsection 2, of the Danish Securities Trading Act, see Exhibit 1 (applicable in the Relevant Period), noting that "*If the account holder keeps an account [in VP Securities] on behalf of one or more owners, this shall be registered by book-entry on the account*" (my insertion).

23.    The view is shared by VP Securities. In a note pursuant to CSDR Article 38(6), Exhibit 2, VP Securities has expressed that "*legal ownership to securities held by and in the name of a participant on behalf of an end-investor [...] also vests in the end-investor*"[18]. As a matter of financial regulations, the Danish Financial Business Act Section 72, Exhibit 3, when referring to omnibus accounts (*Da*. samledepoter), permits commingling of "instruments of customers" and provide that each customer may in the event of insolvency proceedings of a financial institution retrieve "its instruments" from such omnibus account subject to certain conditions[19].

24.    VP Securities operates three kinds of securities accounts: (1) an omnibus account, (2) an individual account, and (3) an end-investor account. Shares held in an individual account and an end-investor account are effectively segregated from shares belonging to other investors and participants in VP Securities[20] and are owned by the persons registered with VP Securities. For shares in an omnibus account, the owners would not be registered by VP Securities. Instead, the shares would be held by the owners in custody on an intermediated basis by a custodian or through a chain of custodians[21].

### III.    Ownership Of Publicly Traded Shares

### A.    The Construct Of Ownership

25.    Throughout Pilgaard's submissions, he contends that "ownership of shares is transferred upon a final and binding agreement to buy and sell shares", Pilgaard Decl. II ¶ 99. This is a misconception. Pilgaard confuses contractual rights with ownership. Ownership of dematerialised shares will not be passed to a purchaser by virtue of the conclusion of a purchase contract.

---

[18] Note by VP Securities: "*Levels of segregation offered by VP SECURITIES A/S*", dated as of 17 August 2017, page 3, Exhibit 20.

[19] End-investor ownership is also recognized in case precedents, see Supreme Court ruling of March 20, 1997 (Ugeskrift for Retsvæsen. 1997.762H), Exhibit 19.

[20] See Note by VP Securities: "*Levels of segregation offered by VP SECURITIES A/S*", dated as of 17 August 2017, page 3, Exhibit 20. VP Securities operated similar account forms in the Relevant Period.

[21] See Sorensen Dep. 49:11-21.

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

26.     A share purchase contract under Danish law, if valid and unconditional, will create contractual rights and obligations between the parties and the parties alone. The legal effect of such contract is that the seller and the purchaser must perform their respective obligations as agreed under the contract. This is not ownership. Ownership of fungible assets (in Danish law referred to as "generic" assets) such as dematerialised shares involves more than just a contractual right between the parties. Ownership must result in a proprietary right to be recognised by the company having issued the shares and creditors of the seller who would have to respect that the shares were owned by the purchaser. And ownership must be enforceable by the courts in a claim for specific performance, i.e. the delivery of the specific assets that have been allocated to the contract[22].

27.     Ownership requires: (a) an unconditional, binding and valid contract and (b) if the asset sold is generic such as dematerialised shares, *segregation* i.e., measures that identify, segregate and allocate particular instances of the "genus" and convert these into specific assets capable of being transferred under a contract and specific assets which a person could logically be regarded as owning. The require-ment of segregation is explained in more detail in Paragraphs 32 - 47 (B. *Conditions For Ownership – Segregation*)

28.     Inferring "ownership" from a contract alone would be contrary to the fact that ownership is a proprietary right. Before specific shares are segregated and allocated to the contract, there are no specific shares capable of being owned. With respect to shares, ownership entails the owner being able to exer-cise shareholder rights (such as voting in general meeting and dividend rights).  No such shareholder rights can come into existence for a purchaser unless and until such rights must be recognised by the Issuer of the shares. If no shareholder rights must be recognised, "contractual ownership" is not owner-ship.

29.     A contract, in and of itself, is only capable of passing ownership over actual shares owned by the seller. A contract cannot create a share, nor can it pass ownership to an asset that does not exist or

---

[22] Contractual rights could potentially be the subject of an order for performance, but it would have to be for the delivery of dematerialised shares of the same type as contracted for or an order requiring the seller to identify and segregate specific assets and allocate them to the contract. Neither would evidence ownership of specific shares.

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

is not owned by the seller. For seller's lacking ownership, see Paragraphs 54 - 66 (D. *The "Nemo Dat Quod Non Habet" Doctrine*).

30.     The generic nature of dematerialised shares means that ownership cannot pass by virtue of a purchase contract. Dematerialised shares are fungible, a generic asset category defined by type only. Dematerialised shares are fungible, and even if they have been identified in a purchase contract by "x amount of z share-security", they would have less difference between them than sacks of potatoes and resemble "x amount of foreign currency or bank notes". There needs to be an identified asset first before one can test ownership requirements. The construct of "ownership" is not meaningful unless and until it relates to a specific asset. As long as no specific asset exists, the contractual arrangement is akin to a derivative, which does not transfer ownership to its holder. One of the consequences of recognising the concept of "contractual ownership" would be to dilute the requirement of segregation which is necessary for ownership.

31.     Ownership is a binary concept - either you have it, or you don't. At the time of contract making for dematerialised shares, the purchaser does not own the shares until those shares are segregated and delivered at settlement.

## B.    Conditions For Ownership – Segregation

32.     As noted, Pilgaard asserts that ownership to a share passes on conclusion of a final and binding agreement. In particular, in Pilgaard's view, delivery of shares or settlement of the trade, is not a pre-condition of ownership under Danish tax law, Pilgaard Decl. I ¶¶ 155-170 and Pilgaard Decl. II ¶ 97. That is incorrect[23].

33.     Under Danish law, a contract to purchase a dematerialised share will not be effective *inter partes* to transfer ownership until the delivery of such share or the completion of other means of *segregation* of such share from other similar shares for the benefit of the purchaser[24]. Until delivery, the purchaser will not be able to exercise any shareholder rights.

---

[23] See also Sorensen Dep. 64:24-65:7.
[24] See Note by VP Securities: "*Levels of segregation offered by VP SECURITIES A/S*", dated as of 17 August 2017, Exhibit 20: "*Danish law provides that legal ownership of securities vests in the end-investor having acquired title to and received the relevant securities*" (my emphasis).

## Moalem Weitemeyer

| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

34.     Consideration of Danish tax laws does not change that a final and binding contract is insufficient to transfer ownership absent delivery of shares or other means of segregation. Generally, the ownership construct for shares is the same in Danish tax laws and in Danish civil law. If a seller does not own anything in civil law, there is no construct in tax laws that allows the seller to create an asset or transfer ownership[25].   While there may be a difference in the date of transfer of ownership as between Danish tax law and civil law, each of the tax law cases the defendants' expert Pilgaard points to (see Pilgaard Decl. II ¶¶ 101-103) in support of that proposition all involve the eventual delivery of actual shares - confirming that without settlement of the transactions, there can be no transfer of ownership over the shares under any Danish law.

35.     Dematerialised shares in book-entry form are globally recognized as fungible (just as cash). The shares are data in computing systems with no distinction between them. In the context of a sale and purchase, dematerialised shares represent a generic asset class (as opposed to a specific asset) as used in the Danish Sale of Goods Act meaning that a seller of a dematerialised share can perform the sale and purchase contract by delivery of any share in the same class issued by the company in question[26].

36.     In Danish law, a contract to sell and purchase a dematerialised share will, in and of itself, not be effective to transfer ownership. At inception, the contract will, if valid and binding, be deemed an obligation for the seller to deliver any similar share issued by the relevant company at the agreed time. This will be tantamount to a claim against the seller, not ownership, and the purchaser will be unable to require specific performance for an identified, specific asset[27]. In those circumstances, ownership will

---

[25] See Jakob Bundgaard: *Deltagelse i kapitalselskaber – aktionærbegrebet i selskabsretlig og skatteretlig belysning*, 2006, SPO 2006.17, page 7, Exhibit 31. See also Anders Nørgaard Laursen *Kommentarer til udvalgte afgørelser – SKM2016.281.HR*, 2016, RR.SM.2016.0101, page 5, Exhibit 32. Supreme Court Ruling of June 2, 2019, (*Ugeskrift for Retsvæsen.2020.1923 H*), Exhibit 33, used the civil law construct for ownership of shares and held that dividends should be attributed to the persons being the shareholders at the time of the dividend declaration. Pilgaard has previously represented that, as a general rule, tax laws are controlled by civil laws, and that this applies on the issue of ownership to shares, Kasper Bech Pilgaard's submission to the Danish Tax Tribunal in the case Decision of the Danish Tax Tribunal, *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312), page 116, Exhibit 45. I concur. Under Danish law, tax rules ordinarily follow any applicable (non-tax) civil law as regards the meaning and effect of common legal terns and transactions. Unless the language of the relevant taxing statutes or some specific principle of Danish tax law requires otherwise, "a share", "a shareholder", or "a dividend", if such terms are used in defining a tax liability or entitlement, have the same meaning under Danish tax law as under applicable Danish civil law. I acknowledge, however, that the tax treatment of ownership of shares in a stock lending arrangement is different from the civil law view (though I understand that the Defendants in this case claim to have purchased shares not from a stock borrower, but a short seller).

[26] See Søren Theilgaard et al: *Købeloven – med kommentarer*, 2017 (4. udgave), page 81, Exhibit 34.

[27] See Peter Mortensen: *Indledning til tingsretten – tredjemandskonflikter vedrørende løsøre*, 2. edition, 2008, pages 83, 86 and 226, Exhibit 13. On page 83, Peter Mortensen states: "*On the other hand, if the promise relates to a non-specified service – e.g., delivery of a batch of a specific product (genus) or payment of a sum of money – this is not a transfer. The promise creates a claim on a benefit (the shipment or the sum of money), but it does not relate to any specific property (real estate, chattel, promissory notes, etc.) after which the promise cannot be said to*

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

not pass, and the purchaser will not from contract inception be able to exercise any shareholder rights afforded by law and the articles of association in a company. Since the contract is binding and valid, the purchaser will have remedies for seller's failure to deliver. Such remedies will include damages and could potentially include specific performance for delivery of any similar share to the one purchased.

37.     To recognise ownership vested in a purchaser, Danish law, like other jurisdictions[28], requires segregation (*Da.* individualisering*)* from other assets of similar type belonging to the seller or commingled in the custody of a custodian. This applies *inter partes*, not only as a mean of perfection to protect from third parties as inaccurately stated in Pilgaard Decl. I ¶ 153. I believe this to be manifestly supported by consensus among commentators in Danish law and have demonstrated that by providing in Appendix 6 a collection of text written by legal commentators on the subject.

38.     Segregation is the standard for recognising ownership to assets that are *commingled* in the hands of a seller or a custodian[29]. Segregation is irrelevant if the seller or the custodian has no similar assets of the relevant type. For an investor to have ownership of shares through its custody account, the custodian downstream from VP Securities must hold shares that can be traced upstream through every level of custody until the VP Securities level *and* in every such level the shares must be segregated, see also Paragraphs 43-45. If either of the two fails, the investor will have no ownership.

39.     I understand that Defendants claim ownership to Danish securities through certain custodians associated with Sanjay Shah (the "**Solo Custodians**"). If the Solo Custodians held Danish shares for the Defendants, those would need to be held both at VP Securities and all intermediate sub-custodians

---

[*footnote continuation*] transfer the right to a property to the promisee. If the promisor does not fulfil his promise, the promisee may not demand that certain goods be handed over, but can only in general (e.g., by outlay) seek fulfilment in the promisor's assets. Only when a binding segregation of the benefit is made – e.g., separation and labelling of specific goods to fulfil the promise – the right to the separated goods is transferred to the transferee". Similarly, VP Securities has noted that "*Danish law provides that legal ownership of securities vests in the end-investor having acquired title to and received the relevant securities*" (my emphasis), Note by VP Securities: "*Levels of segregation offered by VP SECURITIES A/S*", dated as of 17 August 2017, Exhibit 20. In the same note, VP Securities has for omnibus accounts noted: "*However legal ownership to securities kept in an omnibus account requires the investor to be able to prove ownership when the assets have been commingled with similar assets belonging to other investors and/or the participant's own assets. The participant is obliged by Danish law to maintain a register (account) for each client showing such legal ownership to the securities. Provided that the participant has acted prudently the end-investor should be able to provide such proof of ownership. A transfer of an account to another participant cannot be completed before the client has proved ownership to the securities towards the estate.*"

[28] For an international perspective with emphasis on trading in omnibus accounts, see Chapter 9 in Matthias Haentjens et al.: European Banking and Financial law, 2015, Exhibit 35.

[29] The rightsholder must prove that the standard for segregation is satisfied. Crucial are; whether (i) there has been a separation of objects that (ii) corresponds to the agreed, if (iii) the separation has authority (in the parties' agreement or special legal provisions), if (iv) the purchaser has been notified of the separation, and (v) if the separation appears to be "ordinary" or "binding". See Michael Elmer et al, *Ejendomsretten 1*, 4th ed. 1999, page 51-60, Exhibit 36, with reference to Supreme Court ruling of 28 May 1954 (Reference: Ugeskrift for Retsvæsen.1954.673H) and see also Ulrik Rammeskov Bang Pedersen: "*Rettigheder over værdipapirer. Individualisering og sikringsakt*" in Juristen no. 4 – 2004, page 178, Exhibit 37.

Moalem
Weitemeyer

| Report of | : | Mr. Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

between the Solo Custodians and VP Securities. I understand that Sanjay Shah, the principal behind the Solo Custodians, and the Solo Custodians' counsel has testified in England that the Solo Custodians did not hold any Danish shares on behalf of the Defendants at any sub-custodian. If that is true, then it is impossible as a matter of Danish law for the Defendants to own the Danish shares they claimed to own.

40.    Delivery of a share at settlement of a trade is obviously adequate segregation[30]. Such delivery at settlement concludes the trade *inter partes* and to the rest of the world. The appropriate method of delivery will depend upon the way the share is issued and held. Possibly, there could be other segregation measures that do not qualify as delivery of a share, but which would be sufficient segregation to transfer ownership. The successful completion of clearance for shareholdings registered to the name of the owner in VP Securities is likely one.

41.    For shares held in individual accounts and end-investor accounts made at VP Securities, shares will be registered to the name of each investor as from delivery, i.e. the concurrent time of settlement of the trade and registration for perfection purposes[31]. As from that time, the ownership of such named investor will be deemed effectively segregated[32].

42.    For shares held in omnibus accounts at VP Securities, there will be no registration in VP Securities to the name of each investor, and investors would have to rely on other means of segregation. This comes in the form of registers maintained by financial institutions acting as Account Holding Institutions in VP Securities. Under Section 72(3) of the Danish Financial Business Act, Exhibit 3, each such financial institution must maintain a register for each client showing the client's legal ownership to the shares, and under Section 72(7) of the Danish Financial Business Act, Exhibit 3, such register, if kept

---

[30] See Note by VP Securities: "Levels of segregation offered by VP SECURITIES A/S", dated as of 17 August 2017, Exhibit 20: "*Danish law provides that legal ownership of securities vests in the end-investor having acquired title to and <u>received the relevant securities</u>*" (my emphasis).

[31] Prior to settlement, VP Securities performs clearance based on preadvice from the parties to a trade. VP Securities believes that some protection of ownership is available from clearance. The preadvices are matched to ascertain whether the purchase price and the settlement date correspond. Then, if the validity period specified in the instruct coincide, the transfer order is deemed final and entered into the systems of VP Securities (VP Securities' Clearing rules, 24 June 2013, page 8, Exhibit 38, and the Danish Securities Trading Act Section 57 c, subsection 1, item 1), Exhibit 1. At this point, the transfer order cannot be cancelled or revoked unilaterally by either of the parties, a VP participant or a third party (VP Securities' Clearing rules, 24 June 2013, page 8, Exhibit 38 and the Danish Securities Trading Act Section 57 c, subsection 1, item 2), Exhibit 1. Consequently, the transfer order is now "ready for settlement". Should a participant in VP Securities' system file for bankruptcy or become subject to a similar insolvency event, if a transfer order which involves the participant is deemed "ready for settlement", VP Securities will complete settlement of the transfer order; provided that the transfer order is deemed "ready for settlement" prior to VP Securities' receipt of the notice of bankruptcy or similar insolvency event (VP Securities' Clearing rules, 24 June 2013, page 8, Exhibit 38).

[32] See Note by VP Securities: "*Levels of segregation offered by VP SECURITIES A/S*", dated as of 17 August 2017, Exhibit 20. See also Ulrik Rammeskov Bang Pedersen: "*Rettigheder over værdipapirer. Individualisering og sikringsakt.*" in *Juristen no. 4 – 2004*, pages 176-189, Exhibit 37.

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

properly in accordance with law, will permit each client to retrieve its shares in case of insolvency proceedings[33]. In addition to maintenance of a register, financial institutions must (1) advise clients on the legal effects of the omnibus account, and (2) procure an express consent to the omnibus account from the client.

43.     The obligation to maintain a register (and the other regulatory requirements set out in this Section III.B) also applies financial institutions acting as sub-custodians downstream from VP Securities and being subject to Danish law[34]. In case of a chain of custodians, each custodian must satisfy the obligation to maintain a properly kept register or, if not, the ownership of the end-investor is at risk.

44.     As a matter of Danish law, ownership of the end-investor to shares must be supported by agency relations in the entire chain of custody. If all custodians were subject to Danish law, there would be an additional requirement of *segregation* in each link of the chain for the end-investor's ownership to be recognized. It is evident from industry best practices, recommendations, and studies[35] that a similar requirement of *segregation* in each link applies in many other jurisdictions for an end-investor to be able to claim ownership to securities held by a custodian, be it a global or a sub-custodian[36].

---

[33] *Id.* and Thomas Brenøe et al.: *Lov om finansiel virksomhed* (*En.* Danish Financial Business Act with commentaries), 2019, pages 418-419, Exhibit 39.

[34] The rules will also apply in the other EU Member States as Section 72 of the Danish Financial Business Act, Exhibit 3, implements MIFID II, Articles 16 and 23, Exhibit 40. International market practise is represented in ISSA: *Financial Crime Compliance Principles for Securities Custody and Settlement,* dated August 2015, Exhibit 41.

[35] European Post Trade Forum Report, 15 May 2017, IOSCO Recommendations Regarding the Protection of Client Assets – Final Report, January 2014, Exhibit 30, ISSA Report on Inherent Risks within the Global Custody Chain, February 2017, Exhibit 29, and Association for Financial Markets in Europe, Post Trade Division: Client Asset Protection Task Force – AFME Principles on Asset Segregation, Due Diligence and Collateral Management, September 2016 ("**AFME Principles on Asset Segregation**"), Exhibit 42.

[36] *Segregation* was the EU wide standard for ownership in the Relevant period absent a legislative harmonisation of ownership requirements in the Member States, see *European Post Trade Forum Report*, 15 May 2017, page 85, Exhibit 30, where the following is further provided for: *"There are no harmonised EU rules on the legal position of the end investor in book entry securities. Across the EU, Member States have developed legal mechanisms which are intended to ensure that an end investor enjoys in rem "ownership" of securities, notwithstanding that a chain of intermediaries may separate the end investor from the issuer. These mechanisms work reasonably well within each Member State. But the mechanisms differ from each other and can come into conflict if the chain of intermediaries crosses borders."* The International Organization of Securities Commissions (IOSCO) recommended action by custodians to safeguard clients' securities by measures to control *segregation.* For example, the IOSCO Recommendations Regarding the Protection of Client Assets, Exhibit 43, not only provide for the custodian itself to maintain arrangements to safeguard client assets (Principle 3 of the IOSCO Recommendations Regarding the Protection of Client Assets) – they also require continuous review of the arrangements for safeguarding client assets implemented by any third-party custodian, which the custodian has engaged to hold its clients' assets (*Id.,* explanatory note 3 to Principle 3). See also ISSA's report on the Inherent Risks in the Global Custody Chain, which provides for ongoing validation and reconciliation expected to be implemented by each custodian in the chain (ISSA's report on the Inherent Risks in the Global Custody Chain, pages 9-10 and 34, Exhibit 29). The AFME Principles on Asset Segregation requires full segregation for internal accounts (accounts opened on the books of the custodian to reflect the holdings its clients have with it) and segregation between proprietary assets and securities held on behalf of customers for external accounts (accounts, which are accounts opened by the custodian with a third party custodian) (page 13 of the AFME Principles on Asset Segregation, Exhibit 42).

**Moalem Weitemeyer**

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

45.    If, as the Plaintiff claims[37] and I understand Sanjay Shah has admitted, the Solo Custodians had no Danish shares, and no seller ever delivered any actual shares to any purchaser for the benefit of the Solo Custodians, then under Danish law a contract to sell shares that such seller does not have and never delivers cannot convey any ownership of any kind over shares in any Danish company.  If the Solo Custodians' sub-custodians held no shares for the Solo Custodians, then no shares were delivered to the Solo Custodians' customers.

46.    Pilgaard's contrary view alleging that ownership is transferred at the time of a final and binding agreement without delivery of shares, see Pilgaard Decl. I ¶¶ 156-157 is based upon Skatteforvalt-ningen's Legal Guide and a series of judicial decisions set out therein and outlined in Pilgaard Decl. I ¶¶ 158-170. Neither the Legal Guide nor the decisions support Pilgaard's view. The issue addressed in the Legal Guide and the decisions was *not* the conditions for transfer of ownership but rather the *effective time* for tax purposes in circumstances where the conditions for transfer of ownership *unquestionably* are and were satisfied[38]. This is evident in the Legal Guide Section C.B.2.1.6.1, Exhibit 7, explicitly defining timing as the scope for the commentary: "*The section describes <u>when</u> a share is acquired or disposed of*" (my emphasis). The legal decisions all rule on facts where the trades were completed and no issue of lack of segregation was relevant as they all were private companies with materialized shares. The timing aspects of taxation was also the only issue before and ruled on by the Supreme Court in SKM2001.126[39], Exhibit 8. The Supreme Court ruled that ownership passed at the time of issue of a broker trade confirmation[40] but that cannot be construed to imply that the conditions for ownership were met by virtue of the trade confirmation[41].

---

[37] See page 40, section VI A, subsections 132-138, Expert Report of Bruce G. Dubinsky, where the Plaintiff's forensic expert Bruce G. Dubinsky describes how the Solo Custodians and their sub-custodians never held any shares.

[38] See <u>Appendix 5</u> for a brief description of the cases referenced by Mr. Pilgaard.

[39] Ugeskrift for Retsvæsen 2001.893H, Exhibit 8. The case before the Western High Court contains the argumentation of the High Court, which the Supreme Court wholly agrees with and refers to (Western High Court Ruling of 25 November 1999, section 6, B-2838-97, Exhibit 9).

[40] A broker trade confirmation would normally refer to a trade confirmation for listed shares. However, this was not the case in this Supreme Court Ruling, as the ruling concerned shares in a private limited liability company, the shares of which cannot be listed in Denmark.

[41] In the Defendant's pleading for the Danish Tax Tribunal, see Sections 65-71, Pilgaard refers to the preparatory works to the Danish Taxation of Capital Gains on Shares Act (see page 117 of Decision of the Danish Tax Tribunal, *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312) Exhibit 45). However, the preparatory works merely confirm that it is solely the *effective time* for tax purposes that is determined by the entry into of a final and binding sales agreement. See also Sorensen Dep. 61:22-24 where Sorensen states that no book entry is made in VP Securities on the trade date.

Moalem
Weitemeyer

| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

47.     Consequently, both the guidance and the case law referred to by Pilgaard deal with instances where (i) the seller of the share owned the share(s) transferred, and (ii) the share sale and purchase was ultimately completed by delivery of the shares, possibly after exercise of a put or call option, and are thus irrelevant in the context of determining *what* is required to transfer ownership to dematerialised shares.

## C.     Conditions For Ownership – Settlement (Delivery)

48.     As noted above, settlement by delivery of shares is the typical mean of the *segregation* which is   required to pass ownership of dematerialised shares.  There are additional reasons why *settlement*, also*,* is a prerequisite for ownership[42].

49.     Ordinarily in share trading, the seller and the purchaser will have agreed a future settlement date for simultaneous delivery of shares and payment[43]. This trade term is referred to as delivery versus payment or "DvP". In on-exchange DvP trading, and in off-exchange trading (such as shares held away from VP Securities in a chain of custody) on on-exchange terms, the parties will under Danish law be deemed to have agreed that ownership shall not pass until settlement. In other words, the seller of shares will be deemed to have retained title until payment.

50.     Nasdaq rules for on-exchange trading did not stipulate the time of transfer of ownership – and those rules were binding for all on-exchange trades with no option for the parties trading to add such time of transfer. The absence of regulation of a significant issue is in my view due to the fact that market participants expect ownership to pass on delivery at the settlement date and will be deemed to have so agreed. Legal theory provides that (a) there is a legal requirement to segregate or deliver shares at set-tlement for ownership to pass  (and only settlement is relevant in practice), (b) until delivery of the shares sold at settlement, a purchaser of a dematerialised share will be unable to exercise shareholder rights afforded by law and the articles of association in respect of such share, which is a prerequisite for

---

[42] It follows that I disagree with Pilgaard, see Pilgaard Decl. II - heading at section II C (*Settlement Is not A Prerequisite For Ownership*) Settlement would carry weight as a condition independent from segregation, if there is no segregation conflict because a seller sold all of its shares of a specific type to a single purchaser.

[43] In case of lack of performance by the other party, the seller and the purchaser would each have a right to hold back their respective performance pursuant to Section 14 of the Danish Sale of Goods Act.

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

ownership, and the seller will remain registered by the Issuer as the owner of the shares, and (c) settlement is usually the stop date for seller's remedy of rescinding a purchase contract for failure by the purchaser to pay.

51.     The conclusive argument for title to pass at settlement lies, however, in Danish securities laws and their legislative history. Section 72, subsection 1, of the Danish Securities Trading Act permits Account Holding Institutions acting as a seller to make title transfer to fund assets (Da. *fondsaktiver*), including shares, conditional upon payment <u>after</u> delivery of the fund asset. This rule creates a surrogate, retention of title, for the otherwise applicable rule of simultaneous exchange of shares and payment[44] and is necessary to facilitate initiation on the trade date of the credit of the shares with a deemed legal proviso instituting the match of money versus payment on the settlement date. Section 72, subsection 1, succeeded a similar provision in Section 13 a, subsection 2, of the Danish Central Securities Depository Act. As part of the preparatory works, the Ministry of Industry formed a task force, two members of which (the CEO and a Head of Division at VP Securities) noted in the White Paper[45] that "in trades with fund assets (Da. *fondsaktiver*) there is an inseparable relation between transfer of title to fund assets and the purchaser's payment of the consideration (purchase price)" (my translation)[46]. In the government proposal to parliament of Section 13 a, subsection 2, of the Danish Central Securities Depository Act in 1982, the DvP convention was confirmed[47].

52.     For the same reasons discussed above in Paragraph 46, the cases Pilgaard relies on — SKM2001.126 HR, SKM 2011.533 HR, and SKM 2010.259 BR — do not support his argument that parties may transfer ownership of shares without settlement of their transactions. Pilgaard Decl. II ¶¶ 101-103. In each case, the court considered only the timing of the transfer for taxation purposes. While I do not dispute that tax law and civil law may differ with respect to the treatment of the *timing*

---

[44] See Jesper Lau Hansen: *Værdipapirhandelsloven med kommentarer* (En. *The Danish Securities Trading Act with Comments*), 2013, 9th ed., page 567.

[45] White Paper Section 4.B.3.4.

[46] The same members also noted in section 4.B.2.1 that "it is far from rare, in fact almost the main rule, that the same fund assets change owner several times on the settlement date" (my translation). None of these statements were contradicted by the remaining six members of the task force.

[47] See comments to section 1, no. 8 in proposal no. 35 of 20 October 1982. In 1982, the government proposed, and the parliament later adopted adjustments, to the 1980 Act that had instituted the first Central Securities Depositary in Denmark and dematerialised share trading. The adjustments were minor and accommodated operational experiences observed in the period 1980-1982.

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

of ownership transfer in certain transactions, none of these cases demonstrate that parties may create through contract the transfer of an ownership right that the purported transferor never owned and never settled. Similarly, Pilgaard mischaracterizes the holding in the recent decision in SKAT's case against the Danish law firm Bech-Bruun (discussed further in Paragraphs 79 – 82), to the extent that he concludes the court agreed that ownership in shares may be transferred without settlement of the trade.

### D.     The "Nemo Dat Quod Non Habet" Doctrine

53.     Pilgaard appears to assert that a mere contract can transfer ownership of shares in a Danish company, regardless of whether or not the seller holds any shares or acquires any for delivery by the settlement date. According to Pilgaard, "*Danish law allows a custodian with equal and offsetting positions ... to engage in "netting"*" and internalized settlement (Pilgaard Decl. I ¶¶ 204-208) such that the custodian does not need to obtain external shares in order to settle its customers' transactions", *Id*.

54.     Pilgaard's view is incorrect and conflicts with principles of Danish law expressing as a rule of law that a seller, who does not own an asset, is incapable of transferring ownership to a purchaser. These principles are fundamental property law and will be applied across asset classes, including dematerialised shares, and will be applied for purposes of tax laws requiring ownership to shares, see Paragraph 34.

55.     Danish law recognises as a non-statutory legal principle the "*nemo dat quod non habet*" ("no one gives what they do not have") doctrine. Being a principle of law, the Danish courts would apply the doctrine in rulings and, if the asset has been sold by persons with flawed ownership, order repossession in favour of the original owner of an asset [48].

56.     As described in Paragraph 11, ownership generally provides a person with the right to possess and use, and the right to contract over, any given asset, subject in all events to restrictions by law.

---

[48] This principle is manifest in *Danske Lov* passed by King Christian V on April 15, 1683, Section 6-17-5 (my translation): "*If anybody purchases stolen goods and the owner reclaims the goods, then he who purchased (lawfully and witnessed) shall prove that he in fact purchased the goods and under oath swear that he is neither a thief nor a thief's accomplice and do not know where his seller was and still shall have lost the property. If he who purchased can find his seller, then he can claim damages.*" The principle dictates that an owner of stolen goods will have a claim for repossession of the stolen goods from subsequent resellers. In effect, this rule of law underpins the *nemo dat quod non habet* principle since a right for the owner to repossess an asset means that a person purporting to convey ownership in a downstream chain to something he does not lawfully own by definition cannot do so.

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

57.     Naturally, a person can only legally contract for any given property in accordance with the terms and conditions agreed *inter partes* with the person conveying such property to him. This is true, regardless of whether such property right is absolute or partial. That is to say, a person A can only transfer a right to another person B, if A actually holds the right. Accordingly, if person A had no ownership rights, it would not be able to transfer or convey any ownership rights to a buyer, B. Generally, this entails that A can only dispose of its *own* property rights[49]. If the right in question is a pledge, A can only transfer the pledge – not the absolute ownership to the pledged asset, just as a lessee of a car would only be capable of transferring the use right to the car, not the ownership right to the car.[50]

58.     The above views have been articulated in the general Danish law principle that *"a purchaser does not acquire better rights than its seller"*. This principle is manifest in Section 27 of the Danish Debentures Act which has the following wording:

> "If an ordinary debenture is transferred or pledged, the acquirer does not obtain better rights than the transferor, unless explicitly provided for by law."

59.     An example of use of Section 27 is in the Western High Court ruling of 19 December 1963[51], Exhibit 4, where R arranged for D to borrow DKK 4,000 from M. D issued a debenture to M with a guarantee from K. However, as M did not want to provide the loan, R instead used his daughter B's funds – which he managed – to provide the loan. R subsequently arranged for M to transfer the debenture to B. Later, B redeemed the loan and required immediate and full payment from D and K. However, as the loan was never provided and thus did not exist, the court held that M was not capable of transferring the debenture to B. The court held that M was incapable of conveying a right that did not exist to B and as K had not accepted that the guarantee covered a debt to B, K was released from repaying the loan to B. Consequently, the court applied the *"nemo dat quod non habet"* doctrine to the transfer of the debenture with the result that it could not be transferred as it did not exist in the first place.

---

[49] See Henry Ussing: *Aftaler,* 1978, pages 264-265, Exhibit 21. In addition, a contractual entitlement may imply that a person can dispose of another person's asset(s). This would be the case, e.g., at a sale by a pledgee of pledged asset(s) in enforcement proceedings after default by pledgor.
[50] See W.E. von Eyben: *Formuerettigheder,* 1972, page 25, Exhibit 22, and Henry Ussing: *Aftaler,* 1978, page 264, Exhibit 21.
[51] Reference: Ugeskrift for Retsvæsen.1964.307V, Exhibit 4.

M\\ Moalem
Weitemeyer

| Report of | : | Mr. Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

60.    There is consensus in Danish legal theory that the "*nemo dat quod non habet*" doctrine applies not only to ordinary debentures and claims, but universally to transactions involving property rights[52]. By definition it is irrelevant whether or not a transfer of an asset, which a seller does not own, is valid[53]. Invalidity of a contract is based on a set of specific grounds in Danish law, but lacking ownership is an even more fundamental flaw causing any agreement for transfer to be ineffective in transferring title in the first place without the need to invoke a specific validity ground[54]. As the seller does not have any legal control over the asset, it cannot dispose of it and the question on whether or not the transfer is valid does not arise.

61.    If a seller contracts to transfer shares that it does not own, the seller is liable to the purchaser on an objective basis[55], *i.e.* seller would be contractually liable without any negligence or "*scienter*" required on seller's part.  But that would not create ownership rights for the purchaser to any shares.

62.    As noted, the "*nemo dat quod non habet*" principle has a broad reach to any property right in any asset class. For example, the Supreme Court ruling of 20 March 1974[56], Exhibit 5, confirms that the principle applies to a slot machine. In this case, a seller A had sold a slot machine to a purchaser B with title reservation (*Da.* ejendomsforbehold). B resold the slot machine to C and received the purchase price without paying A. The Supreme Court held that the title reservation was valid, and that C did not become the owner – despite the purchase agreement and payment of purchase price – as B, from which he derived his right, was not the owner of the slot machine. Consequently, A retained its title to the slot machine.

63.    The legal principle applies to dematerialised shares registered with VP Securities. In a ruling from the Maritime and Commercial High Court of 9 May 1994[57], Exhibit 6, a stockbroker firm had

---

[52] See Lennart Lynge-Andersen, Peter Møgelvang-Hansen og Anders Ørgaard: *Gældsbrevsloven med kommentarer* (*En.* The Danish Debentures Act with commentaries), 2007, page 184, Exhibit 23, Henry Ussing: *Obligationsretten – Almindelig del* (*En.* The Law of Obligations – Ordinary Part), 1967, page 211, Exhibit 24, and Peter Mortensen, *Indledning til Tingsretten (En.* Introduction to the law of property), 2nd edition, 2009, page 148, Exhibit 13.

[53] See Lennart Lynge-Andersen, Peter Møgelvang-Hansen og Anders Ørgaard: *Gældsbrevsloven med kommentarer,* 2007, page 184, Exhibit 23.

[54] Which is consistent with the statement by the Maritime and Commercial High Court in the case referred to in Paragraph 34.

[55] Section 59 of the Danish Sales of Goods Act, Exhibit 25, on defective title. This rule of law *a priori* confirms that defective title of the seller will prevent ownership of the purchaser of an asset. The purchaser is instead entitled to claim damages.

[56] Reference: Ugeskrift for Retsvæsen.1974.363H, Exhibit 5.

[57] Reference: Ugeskrift for Retsvæsen.1994.719Ø, Exhibit 6.

| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

unlawfully registered a client's shares in its own name. Shortly after, the broker firm went bankrupt. The bankruptcy estate claimed that the estate had ownership to the shares, as it was registered with VP Securities and, thus, had perfected its ownership rights in accordance with the then applicable perfection requirements[58]. The court held that the registration of the shares in the broker firm's own name was unlawful as the broker firm did not own the shares and awarded ownership to the client. The ruling did not address a contractual transfer of ownership from a transferor with no rights, but a conflict between the owner and the bankruptcy estate of the person registered being one step further down the chain of transfers from the transferor. In my view, the ruling would have been the same, had the broker firm sold the shares to a third party.

64.        It is true that in certain circumstances Danish law permits netting and internalized settlement among several customers of the same custodian without compromising a purchaser's ownership rights[59]. For regulatory requirements, see Paragraph 43 and 45. However, netting and internalized settlement are premised on the custodian holding actual shares. Danish law does not recognize that a share in a Danish company can be created by two parties trading in a vacuum[60] or in circular transaction patterns cancelling each other[61]. If none of the sellers having accounts with the custodian own (or has contracted to own) any share of the relevant class, none of the sellers are capable of conveying ownership to any purchaser under the "*nemo dat quod non habet*" principle, and any "net" or "internalized" settlement would not cause a transfer of ownership of any shares to the custodian's purchasing customers. Similarly, if the total number of shares owned and ultimately sold by net-sellers is insufficient to cover orders of net-purchasers, netting and internalised settlement will not be possible at all, or at least not be possible

---

[58] The perfection requirement was provided for in Sections 8 and 11 of the Danish Act on Central Securities Depositories, which was repealed and replaced by identical provisions in Sections 66 and 69 of the Danish Securities Trading Act, Exhibit 1.

[59] Netting or internalised settlement does not change the requirement for segregation and delivery of shares (see also Sorensen Dep. 16:1-9). While Article 3 of the Settlement Finality Directive, Exhibit 26, does allow for netting, Article 3 sets out as a condition for enforceability and binding effect on third parties that transfer orders have been entered into a system. Pilgaard Decl. I ¶ 205 is incomplete and fails to state that condition. Pursuant to Article 3, the transfer orders must be entered into a system before the moment of opening of the insolvency proceedings, see also Danish Securities Trading Act Section 57, Exhibit 1, which transposed article 3 in the Relevant Period. Prior to settlement, VP Securities performs clearance based on preadvice from the parties to a trade. VP Securities believes that some protection of ownership is available from clearance and clearance in the systems of VP Securities likely meets the standard for segregation under Danish law. In clearance, the preadvices are matched if the purchase price and the settlement date correspond. Then the transfer order is deemed final, cleared and "entered into" the systems of VP Securities. At this point, the transfer order cannot be cancelled or revoked unilaterally by either of the parties, a VP participant or a third party.

[60] See Sorensen Dep. Vol II 14:3-25.

[61] Circular transaction patterns with no shares, dividends and cash flows were the facts in Supreme Court ruling of November 20, 2023 in BS-20331/2022-HJR referred to as a fraud, see Paragraphs 79 – 82.

Moalem
Weitemeyer

| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

for the unsatisfied portion of the net-purchase orders, as a result of failure to deliver the full amount of the shares or segregate the shares, see Paragraph 17[62].

65.     In this case, plaintiff SKAT contends that the defendant pension plans purported to obtain shares through a series of circular transactions, in which a seller that does not hold shares contracts to sell shares to a pension plan that also does not hold shares. The seller purports to borrow the same shares to cover the sale to the pension plan by borrowing (through intermediaries) from the pension plan itself. By application of "*nemo dat quod non habet*" principle, where neither the seller nor the pension plan had any shares to begin with, the seller could not transfer any ownership interest.

### E.     The "nemo dat quod non habet" doctrine applies to dividends

66.     Dividends are a distribution of equity made by a company to the owners of its shares, its share-holders[63]. Dividends are declared by way of a corporate resolution of the general meeting (or by the Board of Directors with special authority granted by the general meeting) at no consideration and, as of the time of declaration, (a) generates an enforceable right to the dividends for the shareholders against the company, (b) depletes the reserves distributed, and (c) creates a liability for the company in the amount declared. Publicly traded companies can only pay *dividends* through VP Securities[64]. The dividend distribution will be made as set out in <u>Appendix 4</u>.

67.     For persons not registered with VP Securities, the holding of shares and remittance of dividends at any level of custody in a downstream chain of custodians will be governed by a custody services agreement made between such persons and the custodians. In my view, however, any entitlement to dividends will require ownership of shares as a prerequisite for receipt. This is a consequence of the dividend construct under Danish law, being a corporate distribution of equity to shareholders, and this

---

[62] See Sorensen Dep. Vol II 28:21-28:25. In Pilgaard Decl. II ¶ 95, Pilgaard refers to Sorensen Vol II 60-63 in the context of ownership associated with net settlement. Sorensen was not questioned about ownership and did not offer testimony on it. She explained the functionality of net settlement in trading of shares.

[63] Sections 179 through 184 of the Danish Companies Act, Exhibit 11.

[64] A prerequisite for registration with VP Securities is that dividends are paid through VP Securities in accordance with its rules, see page 293 of VP Securities' System Guidelines, 19 December 2011, Exhibit 27, and page 5 of VP Rules A-D, applicable as of 17 June 2013, Exhibit 28, where VP Securities refers to Section 71, subsection 2, of the Danish Securities Trading Act, Exhibit 1, and adds that: "*[…] An issuer's provisions [in its articles of association] that prescribe payments [of interest, <u>dividends</u> and capital] in a different way, i.e. by registration in the share-holders' register, are not in accordance with the procedure for dematerialised assets.*" (my insertions and emphasis) VP Securities further states that: "*Consequently, it is a condition for registration of dematerialised securities with VP Securities that the terms of the securities allow VP Securities to act as a payment intermediary [of interest, <u>dividends</u> and capital]*" (my insertions and emphasis).

# Moalem
# Weitemeyer

| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

construct must be determined under Danish law notwithstanding any choice of law in a custody services agreement[65].

68.     If, by reason of the "*nemo dat quod non habet*" principle or any other legal impediment, a person does not become an owner of shares, they will not obtain the right to receive a dividend as detailed in Paragraph 66. Accordingly, any payment received by such person from its custodian (either directly or on behalf of a seller) will not, in my view, be *dividends*.

## F.     The Term "Beneficial Ownership"

69.     Pilgaard seems to use the term "beneficial ownership" in the context of shares for ownership only based on a contract (for which I refer to other parts of this Declaration) or a special broad tax concept.

70.     The term "beneficial ownership" as used in the "**Double Taxation Convention between Denmark and the United States of America**"[66] is a construct defining recipients of payments, primarily dividends, for the purpose of allocating taxation between the two nations.

71.     As already noted in Paragraph 34, the ownership construct in Danish tax laws and Danish civil law is generally the same and has the meaning set out in the opinions herein. The concept of "beneficial ownership" is not, in my view, a Danish law concept with any strict meaning and does not denote a special form of ownership for shares issued by a Danish company. In particular, "beneficial ownership" does not imply that two trading parties can create a share of a Danish company or a dividend that does

---

[65] See ISSA's "*Report on Inherent Risks within the Global Custody Chain*", February 2017, page 23, section 3.3, Exhibit 29: *"[…] the ability for an investor to gain access to their assets will depend on their rights in respect of i) the law of the country where the assets are issued (the law of incorporation of the securities (governing law) ii) the country where they are held in custody and iii) the law of the local CSD."* See also the European Post Trade Forum Report of 15 May 2017, page 85, Exhibit 30: *"… there are no harmonised EU rules on the legal position of the end investor in book entry securities. Across the EU, Member States have developed legal mechanisms which are intended to ensure that an end investor enjoys in rem "ownership" of securities, notwithstanding that a chain of intermediaries may separate the end investor from the issuer. These mechanisms work reasonably well within each Member State. But the mechanisms differ from each other, and can come into conflict if the chain of intermediaries crosses borders. The lack of harmonised rules on the end investors' legal position in cross-border settings constitutes a barrier to the CMU."*

[66] The Convention between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Estates, Inheritances, Gifts and certain other Transfers of 27 April 1983 with subsequent amendments the latest being the Protocol Amending the Convention between the Government of the Kingdom of Denmark and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income of 2 May 2006.

**Moalem**
**Weitemeyer**

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

not exist. If shares or dividends do not exist, they cannot be owned, beneficially or otherwise. Danish law does not recognize ownership of shares or dividends that do not exist.

### IV. Short selling

72.    Pilgaard has suggested that combined ownership interests of shares, at any given time, could exceed the number of shares issued by the company, see Pilgaard Decl. II ¶¶ 85-86. In the following, I focus on Pilgaard's comments regarding short selling, including the company GameStop.

73.    Short sale activities cannot give rise to more ownership interests in shares of a Danish company than the number of shares issued by such company.

74.    "Short selling" is a strategy aimed at profiting from a decline in the share price (*baisse* speculation), and the sale of shares as part of that strategy, is, in terms of ownership to the shares sold, not different from any other trade. Ownership will pass to purchasers in on-market transactions, subject to the ordinary conditions for ownership to pass, including delivery or other means of segregation. Transfer of ownership will end ownership for the short seller at the same time as ownership passes to the new owner(-s). Consequently, while short selling could increase the number of shareholders simply because the shares become more widely traded, no additional shares will exist at any time and the combined ownership of shares of such shareholders would remain the same as when the shares were held by the short seller.

75.    A short seller, who has only contracted for future ownership of shares in a derivative transaction at the time of agreeing the short sale, would not own such shares and therefore could not transfer ownership of the shares to the buyer under a short sale. First, an interpretation of the derivative would in most cases lead to the conclusion that the parties did not intend for ownership to pass at the inception of the derivative. In case of a preceding stock lending and borrowing arrangement made by the International Securities Lending Association's Global Master Securities Lending Agreement title will pass at

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

delivery to the short seller (borrower)[67]. Second, the shares would not from conclusion of the contract be segregated in favour of the short seller and ownership could not pass anyway.

76.     Moreover, in the trade from the short seller to the purchaser(-s), the "*nemo dat quod non habet*" principle would prevent the short seller from conveying ownership before such short seller had ownership. The short seller would not have the option to segregate the shares sold from other similar shares (whether from similar shares owned by the derivative counterparty or the seller), which would be a condition for ownership to pass to the purchaser, if the seller had similar shares. As a result, the purchaser(-s) would not be in a position to exercise any shareholder rights under the Danish Companies Act and the articles of association of the company. In short, the purchaser(-s) will not own the share.

77.     Under Danish law, the purchaser(-s) will become the owner(-s) of shares, if and when (1) the short seller becomes the owner of such shares, (2) the shares short sold have been segregated, if required, in the hands of the short seller to the benefit of purchaser(-s) and (3) the time occurs for ownership to pass pursuant the agreement between the short seller and the purchaser(-s). Trades made under the DvP convention applicable for on-exchange trading on Nasdaq Copenhagen, or for off-exchange trading on on-exchange terms, will imply that ownership passes at settlement (See Paragraphs 48 - 51). In each case, when the purchaser becomes the owner, the seller ceases to be an owner.

78.     To the extent short selling is effective to make the purchaser from a short seller an owner of a share, it is because the short seller has acquired the shares and delivered them to the purchaser. The ownership interests in the shares remain constant, and the combined ownership interests of the shareholders in a company at any given point does not and cannot exceed the total number of shares issued by a Danish company.

## V.    Recent Danish Decisions

## A.    The Bech-Bruun Decision

---

[67] See Section 4.2 of the International Securities Lending Association's Global Master Securities Lending Agreement as of January 2010, Exhibit 10.

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

79.    The issue in the in the Danish Supreme Court case *Skatteforvaltningen v. Bech-Bruun I/S* [68] was whether a lawyer of the law firm of Bech-Bruun had acted negligently in advising North Channel Bank regarding a dividend tax refund scheme [69] and whether, as a result, the law firm was liable to pay damages to Skatteforvaltningen.

80.    In the judgement on appeal to the Supreme Court, the High Court rejected liability for the law firm on the ground that the lawyer advising had not acted negligently. In deciding that issue, the High Court noted:

> "The High Court notes that implementing the tax set-up as proforma or without any shares and actual cashflows must be deemed to be ordinary fraud under criminal law that is merely disguised by complicated transactions."

81.    Before the Supreme Court, SKAT noted that its losses were incurred in a criminal setup implying, in essence, that tax exempt US pension plans appeared to have received Danish taxed dividends based on dividend credit records issued by German North Channel Bank even if they had never received dividends. This caused the pension plans to obtain an unlawful dividend tax refund. The defendant law firm agreed that the dividend tax refund scheme involved fictious transactions with no shares, no dividends or cash flows and was a fraud.

82.    The Supreme Court reversed the High Court judgment on appeal and ordered the defendant law firm to pay damages for reckless disregard of the interests of SKAT.

## B.    Cases before the Danish Tax Tribunal

83.    The issues addressed by me in this Declaration have been decided by Danish case precedents [70]. In 2018-19, certain pension plans that I understand are Defendants in the cases before the Court brought claims against Skatteforvaltningen before the Danish Tax Tribunal, the supreme administrative appeal

---

[68] Supreme Court Ruling of November 20, 2023. Reference: BS-20331/2022-HJR, Exhibit 49. The Supreme Court heard the appeal by SKAT of Eastern High Court Ruling of 28 April 2022. Reference: BS-26436/2020-OLR, Exhibit 44. Only the Supreme Court's and the Eastern High Court's rulings and holdings have been made available to me, and I am unaware of the detailed facts of the case.

[69] The North Channel Bank accepted that the scheme, in which the bank issued dividend credit vouchers reflecting the plans purported ownership of shares and dividends but in fact never held any shares or received any dividends for the plans, was tantamount to fraud and pleaded guilty in a criminal case, see Gunnar Volkers Dep., e.g. 24:2-25:8, and 71:4-13.

[70] For the purpose of Paragraph 65, I have relied on case information made available by SKAT for the purpose of this Declaration.

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

body for tax cases. Decisions of the Danish Tax Tribunal are appealable to the Danish courts. Mr. Pilgaard and the law firm in which he is a partner, TVC Advokatfirma København P/S, represented certain of the pension plan plaintiffs[71]. The plan plaintiffs in the Danish Tax Tribunal cases asserted that Skatteforvaltningen's decisions to cancel its previous decisions about dividend refund payments were unlawful. I understand that in all such cases, the Danish Tax Tribunal upheld SKAT's decision or the plan plaintiff withdrew its complaint before the Danish Tax Tribunal could render a decision. I also understand that certain plan plaintiffs whose complaints the Danish Tax Tribunal denied appealed to the Danish courts, but the appeals were withdrawn by the plaintiffs before they were decided. Thus, all Danish proceedings brought by the plan plaintiffs have been concluded, with Skatteforvaltningen successful in each case for which the Tribunal rendered a decision.

84.     To take an example to show how the Tribunal's decision applies to the issues I address, in the case brought by the FWC Capital LLC Pension Plan before the Tribunal, the pension plan argued in relation to ownership of shares that:

(i)     ownership to a share is transferred when a final and binding and unconditional agreement between the parties has been validly concluded[72];

(ii)    settlement of a share trade is no precondition for the transfer of ownership[73];

(iii)   documentation of cash flow from purchaser to seller is not required to evidence a transfer of ownership to a share in a Danish company[74];

(iv)    documentation of transfer of a share from seller's securities depository to purchaser's securities depository is not required to evidence a transfer of ownership to a share in a Danish company[75];

(v)     a purchaser of a share is the owner of the share prior to the share being registered in such person's securities depository[76];

---

[71] *E.g.* Roadcraft Technologies LLC Roth 401(K) Plan, The FWC Capital LLC Pension Plan, and The Proper Pacific LLC 401(K) Plan.

[72] Decision of the Danish Tax Tribunal, *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312), page 116, Exhibit 45.

[73] *Id.* page 116, Exhibit 45.

[74] *Id.* page 116, Exhibit 45.

[75] *Id.* page 116, Exhibit 45.

[76] *Id.* page 116, Exhibit 45.

## Moalem
## Weitemeyer

| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

(vi)    the trade date appearing on the trade confirmation is the time of transfer of ownership;[77] and

(vii)    that they had provided sufficient documentation for the stock trades in question, including trade confirms, broker confirms, custody statements from the Solo custodians, and dividend credit advices from the Solo Custodians.[78]

85.    The Danish Tax Tribunal dismissed all of the plans' claims[79]. Most notably, the Danish Tax Tribunal stated that: "*... refund of dividend withholding tax is conditional upon the [defendant] having owned shares and that the [defendant] has received dividends from these shares from which dividend tax was withheld in connection with payment of dividends. It is the [defendant's] burden to prove that these conditions were fulfilled [...]. The Danish Tax Tribunal determines that the [defendant] failed to prove that this was the case*" (my translation and insertion)[80].

86.    In its decision, the Danish Tax Tribunal held that[81]:

(i)    the defendant was a newly established pension plan with no financial means to perform the alleged share purchases;

(ii)    the defendant had not proved that it had purchased the shares and was the owner of such shares or that it had received any dividends;

(iii)    the documentation provided by the defendant regarding the share transactions (purchase and sale, share lending, and forward contracts) did not evidence the defendant's ownership of shares.

---

[77] *Id.* page 117, Exhibit 45. See also Pilgaard Decl. ¶¶ 151, 157, 168, 170.

[78] Decision of the Danish Tax Tribunal: *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312), page 226, Exhibit 45.

[79] *See* Decision of the Danish Tax Tribunal: *Skatteforvaltningen v. The American Investment Group of New York L.P. Pension Plan* (case no. 18-0005426), dated July 7, 2021, Exhibit 47; Decision of the Danish Tax Tribunal: *Skatteforvaltningen v. Riverside Associates Defined Benefit Plan* (case no. 18-0005368), dated October 2, 2020, Exhibit 48; Decision of the Danish Tax Tribunal: *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312), dated July 16, 2020, Exhibit 45; Decision of the Danish Tax Tribunal: *Skatteforvaltningen v. Proper Pacific LLC 401(k) Plan* (case no. 18-0004312) dated June 26, 2020), Exhibit 46.

[80] Decision of the Danish Tax Tribunal, *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312), page 227, Exhibit 45.

[81] Decision of the Danish Tax Tribunal, *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312), page 227, Exhibit 45.

| Moalem Weitemeyer | Report of | : | Mr. Henning Aasmul-Olsen |
| | Specialist field | : | Danish Law |
| | Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| | Prepared for | : | United States District Court, Southern District of New York |

On these grounds, the Danish Tax Tribunal held that the necessary connection which would evidence share transactions having flowed through the defendant's financials had not been evidenced. Moreover, the Danish Tax Tribunal held, in pertinent part, that[82]:

(iv)    the defendant had not provided documentation to evidence that the defendant had paid any capital to the custodian or other parties involved in the share transactions; and

(v)    the defendant had solely provided fictious contracts, custodial statements, broker confirmations etc. with the custodian or other players acting in the alleged share transactions, which did not evidence that the custodian had traded shares on behalf of the defendant.

87.    The Danish Tax Tribunal concluded that the defendant could not be considered as the owner of the shares and could not be deemed to have received dividends. As a result, the Danish Tax Tribunal decided that Skatteforvaltningen had paid out dividend refunds on an inaccurate basis and that it was legitimate to cancel the dividend refund payments.[83]

88.    Consequently, the Defendants have unsuccessfully submitted the same argumentation for the allegations as they now do in the Dispute.

---

[82] Decision of the Danish Tax Tribunal, *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312), page 227, Exhibit 45.
[83] Decision of the Danish Tax Tribunal, *Skatteforvaltningen v. The FWC Capital LLC Pension Plan* (case no. 18-0004312), page 227, Exhibit 45.



| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

Pursuant to 28 U.S.C. § 1746 the undersigned Henning Aasmul-Olsen declares under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 24, 2024

Name: Henning Aasmul-Olsen

Title: Partner

# M Moalem
Weitemeyer

| Report of | : | Mr. Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

**Appendix 1 – Curriculum vitae of Mr. Henning Aasmul-Olsen**

**Experience**

Present and past positions

| Year | Activity |
|---|---|
| 2018- | Partner at Moalem Weitemeyer Advokatpartnerselskab; heading the firm's Capital Markets practice. |
| 2016-2018 | Partner at Horten Law Firm |
| 2010-2016 | Partner at Bruun & Hjejle Law Firm |
| 2007-2010 | Executive director and co-head of Corporate Finance at Danske Bank (the largest bank in Denmark); Strategic and Financial advisory |
| 2006-2007 | Senior Advisor at Carnegie Investment Bank; Strategic and Financial Advisory |
| 1996-2006 | Partner and Managing Partner at Jonas Bruun Law Firm |
| 1991-1996 | Associate at Jonas Bruun Law Firm |
| 1985-1990 | Associate at Hjejle Gersted & Mogensen Law Firm |

Selected Work

For years, Henning Aasmul-Olsen have advised clients on corporate transactions, mostly M&A and capital markets transactions such as public-to-private M&A and defense work, IPOs, accelerated bookbuild offerings and rights issues.

According to Mergermarket, Henning Aasmul-Olsen is among the most active M&A lawyers in Denmark, measured by deal value in the period from 1 January 2011 when he returned to legal practise after four years as an investment banker. Henning is credited with a deal value of EUR 31.71 bn in aggregate for that period.

Moalem
Weitemeyer

| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

Clients for capital markets work include several companies in the C 25 index served both as a legal and a financial advisor.

Henning Aasmul-Olsen has served as a chairman of AGMs and EGMs to several publicly traded companies.

Past litigation experience includes files before the Danish Supreme Court and the CJEU.

Henning Aasmul-Olsen acted as expert in Danish securities laws on behalf of SKAT and gave evidence to The High Court of Justice Business and Property Courts of England and Wales King's Bench Division Commercial Court in the consolidated Claims: CL-2018-000297, CL-2018-000404, CL-2018-000590, CL-2019-000487 and CL-2020-000369 in litigation that presented similar issues to the issues before the Court.

Publications

| Year | Activity |
|------|----------|
| 2020 | Sustainable Finance 2020: Green Bonds and Beyond, article in Accounting and Auditing |
| 2015 | Chapter on Capital Markets in "Corporate Crimes", Iversen, Karnov Group |

**Academic qualifications**

| Year | Activity |
|------|----------|
| 2006-2007 | Corporate Finance Modular Programme, London Business School, London, United Kingdom |
| 1991 | Master of Laws (LL.M), University of Michigan, Ann Arbor, Michigan, United States, with courses in Securities Regulations and Advanced Topics in Securities Regulation |
| 1980-1985 | Master of Laws (LL.M), University of Copenhagen, Copenhagen, Denmark. Graduated with the highest-grade point average of 161 students receiving the Master degree. |

M\\ Moalem
Weitemeyer

| Report of | : | Mr. Henning Aasmul-Olsen |
|-----------|---|--------------------------|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

**Professional qualifications**

| Year | Activity |
|------|----------|
| 1994 | Privilege of audience before the Danish Supreme Court |
| 1989 | Privilege of audience before the Danish High Courts |
| 1988 | Admission to the Danish bar |
| N/A | Member of the International Bar Association |

**Specialist Fields**

My specialist fields are Danish securities laws (including corporate law) and market practises for trading, clearance, and settlement in securities traded in the public markets.

## Moalem Weitemeyer

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

**Appendix 2 – Glossary**

| Term | Meaning |
|---|---|
| **Account Holding Institution** | Danish and foreign financial institutions entitled and obliged to make book entry reporting in the systems of VP Securities. |
| **AFME Principles on Asset Segregation** | Association for Financial Markets in Europe, Post Trade Division: Client Asset Protection Task Force – AFME Principles on Asset Segregation, Due Diligence and Collateral Management, September 2016. |
| **Clearance** | Clearing occurs after a trade is executed. It is the process of checking whether the terms of a securities sales and purchase contract can be fulfilled by settlement, including checking that parties have sufficient securities and money to complete the transaction as contemplated. |
| **CSD** | Central Securities Depository. |
| **CSDR** | Regulation (EU) no. 909/2014 of the European Parliament and of the Council of 23 July 2014 on improving securities settlement in the European Union and on central securities depositories and amending Directives 98/26/EC and 2014/65/EU and Regulation (EU) no. 236/2012. |
| **Court** | United States District Court for the Southern District of New York in the United States of America. |
| **Danish Companies Act** | The Danish Companies Act applicable in the Relevant Period. |
| **Danish Business Authority** | The Danish Business Authority (*Da.* Erhvervsstyrelsen). |
| **Defendants** | Acer Investment Group, LLC, American Investment Group of New York, L.P. Pension Plan, Basalt Ventures LLC Roth 401(k) Plan, David Schulman, Doston Bradley, John van Merkensteijn, Michael Ben-Jacob, RAK Investment Trust, Richard Markowitz, Riverside Associates Defined Benefit Plan, RJM Capital Pension Plan, Roadcraft Technologies LLC Roth 401(k) Plan, Robert Crema, Robert Klugman, |

## Moalem Weitemeyer

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

Roger Lehman, Ronald Altbach, Routt Capital Trust, Stacey Kaminer, The FWC Capital LLC Plan, The Proper Pacific LLC 401K Plan, and ED&F Man Capital Markets Ltd. (third-party defendant).

**Dispute**

Case no. 18-md-2865 (LAK) at the United States District Court for the Southern District of New York in the United States of America.

**Double Taxation Convention between Denmark and the United States of America**

The Convention between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Estates, Inheritances, Gifts and certain other Transfers of 27 April 1983 with subsequent amendments the latest being the Protocol Amending the Convention between the Government of the Kingdom of Denmark and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income of 2 May 2006.

**DvP**

Delivery versus Payment, a trade term in securities trading meaning that the delivery of shares at the future settlement date is contingent upon simultaneous payment (and vice versa).

**Exhibit**

An exhibit to this Declaration.

**Gunnar Volkers Dep.**

Remote VTC videotaped deposition under oral examination of Gunnar Volkers in the Dispute dated June 8, 2021.

**ISSA**

The International Securities Services Association.

**MiFID II**

Directive 2014/65/EU of the European Parliament and of the Council of 15 May 2014 on markets in financial instruments and amending directive 2002/92/EC and directive 2011/61/EU.

**Nasdaq Copenhagen**

Nasdaq Copenhagen A/S.

**Declaration**

This declaration.

# Moalem
# Weitemeyer

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

**Pilgaard Decl. I**      Declaration, dated April 27, 2022 of Foreign Law of Kasper Bech Pilgaard in the Dispute.

**Pilgaard Decl. II**      Declaration, dated June 27, 2022 of Foreign Law of Kasper Bech Pilgaard in the Dispute.

**Plaintiff**      The Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen).

**Relevant Period**      The period between August 2012 and July 2015.

**Paragraph**      A paragraph of this Declaration, unless otherwise stated.

**Settlement**      The process where a transaction involving dematerialised securities is completed and the purchaser receives the purchased securities and the seller receives the corresponding payment.

**Settlement Finality Directive**      Directive 98/26/EC of the European Parliament and of the Council (the Settlement Finality Directive as amended).

**Solo Custodians**      Certain custodians associated with Sanjay Shah.

**Sorensen Dep.**      Remote VTC videotaped deposition under oral examination of Helen Sorensen in the Dispute dated 21 September 2021.

**Sorensen Dep. Vol II**      Remote VTC videotaped deposition under oral examination of Helen Sorensen in the Dispute dated 7 December 2021.

**VP Securities**      VP Securities A/S acting in its capacity as CSD, unless otherwise set forth.

**White Paper**      White paper no. 948 of 1982 on implementation of act no. 179 of 14 May 1980 on a central securities depository.

Moalem
Weitemeyer

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |



| Report of | : | Mr. Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

**Appendix 3 – Rules and regulations, literature and other materials considered**

In preparing this Report I have considered the below material:

**Regulation**

| Date | Material |
|---|---|
| 27 November 2020 | The Danish Capital Markets Act as amended from time to time (Consolidated Act no. 1767 of 27 November 2020). |
| 26 June 2020 | The Danish Corporations Taxes Act as amended from time to time. |
| 8 August 2019 | The Danish Tax Assessment Act: |

- 2011: Consolidated act no. 1017 of 28 October 2011
- 2013: Consolidated act no. 405 of 22 April 2013
- 2014: Consolidated act no. 1041 of 15 September 2014

| 8 August 2019 | The Danish Financial Statements Act as amended from time to time (Consolidated Act no. 838 of 8 August 2019). |
|---|---|
| Amended from time to time | The Danish Contracts Act (currently Consolidated Act no. 193 of 2 March 2016). |
| Amended from time to time | Danish Act on Taxation of Income and Property. |
| 29 December 2015 | The Danish State Tax Act (Consolidated Act no. 1883 of 29 December 2015). |
| Applicable in the Relevant Period | The Danish Financial Business Act: |

- 2011: Consolidated act. no. 885 of 8 August 2011
- 2012: Consolidated act no. 705 of 25 June 2012
- 2013: Consolidated act no. 948 of 2 July 2013
- 2014: Consolidated act no. 928 of 4 August 2014

2015: Consolidated act no. 182 of 18 February 2015

| Applicable in the Relevant Period | The Danish Securities Trading Act: |
|---|---|

- 2012: Consolidated act no. 855 of 17 August 2012
- 2013: Consolidated act no. 219 of 20 February 2013
- 2013: Consolidated act no. 982 of 6 August 2013
- 2014: Consolidated act no. 227 of 11 March 2014
- 2014: Consolidated act no. 831 of 12 June 2014

Report of              :    Mr. Henning Aasmul-Olsen
Specialist field        :    Danish Law
Retained by           :    Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen)
Prepared for          :    United States District Court, Southern District of New York

| | |
|---|---|
| Applicable in the Relevant Period | The Danish Companies Act (consolidated act no. 610 of 28 April 2015 (until 30 June 2015) and consolidated act no. 1089 of 14 September 2015 (from 1 July 2015). |
| 1 June 2015 | Act no. 739 of 1 June 2015 on amendment of among other the Danish Companies Act. |
| 15 May 2014 | Regulation (EU) no. 600/2014 of the European Parliament and of the Council (MiFIR) . |
| 15 May 2014 | Directive 2014/65/EU of the European Parliament and of the Council (MiFID II). |
| 11 December 2013 | Executive Order no. 1476 on filing for registration, registrations, fees and announcements etc. with the Danish Business Authority. |
| 22 October 2013 | Directive 2013/50/EU of the European Parliament and of the Council (the Transparency Directive Amending Directive). |
| 26 June 2013 | Executive Order no. 819 on registration of dematerialised securities with a central securities depository. |
| 5 July 2012 | Commission Delegated Regulation (EU) no. 918/2012 of 5 July 2012 supplementing the Short Selling Regulation with regard to definitions, the calculation of net short positions, covered sovereign credit default swaps, notification thresholds, liquidity thresholds for suspending restrictions, significant falls in the value of financial instruments and adverse events. |
| 4 July 2012 | Regulation (EU) no. 648/2012 of the European Parliament and of the Council (EMIR). |
| 25 June 2012 | Executive Order no. 668 on major shareholders. |
| 14 March 2012 | Regulation (EU) no. 236/2012 of the European Parliament and of the Council (the Short Selling Regulation). |
| 7 December 2010 | The Danish Withholding Taxes Act (Consolidated Act no. 1403 of 7 December 2010). |
| 4 September 2007 | Executive Order no. 1069 on the conditions for official listing of securities. |
| 10 August 2006 | Commission Directive 2006/73/EC (Implementing Directive MiFID). |
| 2 May 2006 | Convention between the Government of the Kingdom of Denmark and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income. |
| 21 April 2004 | Directive 2004/39/EC of the European Parliament and of the Council (MiFID). |
| 19 May 1998 | Directive 98/26/EC of the European Parliament and of the Council (the Settlement Finality Directive as amended). |

| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| | |
|---|---|
| 17 August 1993 | Executive Order no. 1993 of 17 August 1993 on the Copenhagen Stock Exchange. |
| 27 April 1983 | The Convention between the Government of the United States of Ameri-ca and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Estates, Inheritances, Gifts and certain other Transfers. |
| Repealed | Danish Act on Central Securities Depositories. |

**Case Law**

| Date | Material |
|---|---|
| 28 April 2022 | Eastern High Court Ruling of 28 April 2022. Reference: BS-26436/2020-OLR. |
| 12 March 2020 | Ugeskrift for Retsvæsen.2020.1923H. |
| 16 July 2020 | Decision of the Danish Tax Tribunal, Skatteforvaltningen v. The FWC Capital LLC Pension Plan (case no. 18-0004312). |
| 22 August 2006 | Ugeskrift for Retsvæsen.2006.3050H. |
| 7 October 2005 | Ugeskrift for Retsvæsen.2006.145H. |
| 3 December 2001 | SKM2001.88.HR. |
| 31 January 2001 | Ugeskrift for Retsvæsen.2001.893H. |
| 3 March 2000 | Ugeskrift for Retsvæsen.2000.1413V. |
| 3 March 2000 | TfS.1998.408 LR. |
| 20 March 1997 | Ugeskrift for Retsvæsen.1997.762H. |
| 30 January 1997 | Ugeskrift for Retsvæsen.1997.444H. |
| 9 May 1994 | Ugeskrift for Retsvæsen.1994.719Ø. |
| 11 January 1982 | Ugeskrift for Retsvæsen.1982.152H. |
| 12 March 1980 | Ugeskrift for Retsvæsen.1980.383H. |
| 4 October 1978 | Ugeskrift for Retsvæsen.1978.880H. |
| 28 June 1977 | Ugeskrift for Retsvæsen.1977.686H. |
| 1964 | Ugeskrift for Retsvæsen.1964.307V. |
| 8 December 1960 | Ugeskrift for Retsvæsen.1961.101H. |
| 28 May 1954 | Ugeskrift for Retsvæsen.1954.673H. |

**Preparatory Works and Reports**

| Date | Material |
|---|---|

Moalem
Weitemeyer

Report of            :    Mr. Henning Aasmul-Olsen
Specialist field     :    Danish Law
Retained by          :    Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen)
Prepared for         :    United States District Court, Southern District of New York

| | |
|---|---|
| 25 February 2015 | Proposal no. 154 of 25 February 2015 on amongst other amendment of the Danish Securities Trading Act. |
| 2010 | *"Legislation on legal certainty of securities holding and disposition"* cited in footnote 9 of the DWF Defendants Defence. |
| 2008 | Preparatory works no. 1498/2008 for the Danish Companies Act (*Da.* Betænkning over modernisering af selskabsretten). |
| 21 December 2005 | Preparatory works to amendment of the Danish Tax Assessment Act Section 16A (act no. 1414 of 21 December 2005). |
| 3 February 2012 | Report from the Commission – Commission Staff Working Paper – Impact Assessment (SEC(2011) 1279 final/2) (TDAD Impact Assessment) |
| 1999 | Regnskabsrådets rapport om Revision af Årsregnskabsloven |
| 29 January 1986 | Proposal for the Danish Stock Exchange Act with remarks. |
| 1985-1986 | Proposal to amend the Danish Companies Act. |
| 29 February 1980 | Proposal for the Danish Securities Trading Act with remarks. |
| 24 February 1905 | Proposal to the Danish Sales of Goods Act with remarks. |

**Guidance**

| Date | Material |
|---|---|
| Applicable in the Relevant Period | SKAT's Legal Guide. |
| 2014 | Statement by the Danish Business Authority. |

**Private Rules and Standards**

| Date | Material |
|---|---|
| 3 September 2020 | VP Securities Rule Book parts 1-5. |
| June 2012 and July 2015 | Nasdaq Nordic Market Model. |
| 2 March 2020 | Nasdaq Nordic Member Rules, version 3.9. |
| Applicable in the Relevant Period | Nasdaq Nordic Member Rules, versions 1.6 – 2.7. |
| Applicable in the Relevant Period | All articles of association of companies listed in Schedule 1A to the Particulars of Claim. |
| May 2019 | The ISSA Financial Crime Compliance Principles for Securities Custody and Settlement, second revision. |

Moalem
Weitemeyer

| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| May 2019 | Background & Overview to ISSA Financial Crime Compliance Principles for Securities Custody and Settlement, first revision. |
| 14 December 2015 | Nasdaq Reporting Guideline, version 1.9, Members' On Exchange trade and Members' and Non-Members' OTC trade Reporting. |
| 27 August 2015 | The ISSA Financial Crime Compliance Principles for Securities Custody and Settlement, first revision. |
| 27 August 2015 | Background & Overview to ISSA Financial Crime Compliance Principles for Securities Custody and Settlement, first revision. |
| 2015 | Chartered Financial Analyst Society Denmark, Recommendations and Ratios. |
| 23 June 2013 | VP Securities' Clearing Rules, applicable as of 23 June 2013. |
| 17 June 2013 | VP Securities' Rules A- D, applicable as of 17 June 2013. |
| 2012 | Market Standards for Corporate Actions Processing, by Corporate Actions Joint Working Group. |
| 19 December 2011 to 10 August 2015 | VP Securities' System Guidelines. |
| 2002 | Custody Services, Controller's Handbook, by Controller of the Currency Administrator of National Banks. |
| 5 February 2002 | Standard terms and conditions for stock lending agreements prepared by the Danish Bankers' Association and the Danish Securities Dealers' Association, 5 February 2002, journal no. 613/03, doc no. 29094. |

**Literature**

| Date | Material |
| --- | --- |
| 2021 | The Complex Commercial Litigation Law Review: Denmark, published in The Law Reviews on 14 January 2021, by Dan Terkildsen and Emil Hald Winstrøm. |
| 2020 | Almindelig kontraktsret, by Bernhard Gomard, Hans Viggo Godsk Pedersen & Anders Ørgaard. |
| 2020 | Årsregnskabsloven med kommentarer, by Henrik Steffensen. |
| 2019 | Securities and Capital Markets Law (Da. Børs- og Kapitalmarkedsret), 6th edition, by Peer Schaumburg-Müller and Erik Werlauff. |
| 2019 | Selskabsret, 11th edition, by Erik Werlauff. |
| 2019 | Danish Financial Business Act - with commentaries (Da. Lov om finansiel virksomhed – med kommentarer), 4th edition, by Thomas Brenøe, Marianne Simonsen, Merete Hjetting and Malene Stadil. |

| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| | |
|---|---|
| 2018 | Konkursloven med kommentarer, by Lars Lindencrone Petersen & Anders Ørgaard. |
| 2018 | The Danish Capital Markets Act with commentaries (*Da.* Kapitalmarkedsloven), 1st edition, by Dan Moalem, David Moalem, Peer Schaumburg-Müller, and Erik Werlauff. |
| 2018 | Finansieringsret, 2nd edition, by Henrik Kure. |
| 2018 | The Danish Companies Act with commentaries (Da. *Selskabsloven*) med kommentarer), 3rd edition, by Lars Bunch and Søren Corfixsen Whitt. |
| 17 August 2017 | Note by VP Securities:" Levels *of segregation offered by VP SECURITIES A/S*". |
| 15 May 2017 | European Post Trade Forum Report. |
| 15 May 2017 | Annex 3 to the European Post Trade Forum Report: Detailed analysis of the European Post Trade Landscape. |
| February 2017 | ISSA Report on the Inherent Risks within the Global Custody Chain. |
| 2017 | Limited liability companies (*Da.* Kapitalselskaber), 5th edition, by Jan Schans Christensen. |
| 2017 | The Danish Sales of Goods Act with comments (*Da.* Køveloven), 4th edition, Søren Theilgaard, Aqbal Amiri and Theis Jacobsen. |
| 2017 | Aftaler og Mellemmænd, 7th edition, by Lennart Lynge Andersen and Palle Bo Madsen. |
| 2016-2017 | Report on administration of dividend tax, by Skatteministeriet. |
| September 2016 | AFME Post Trade Division: Client Asset Protection Task Force. AFME Principles on Asset Segregation, Due Diligence and Collateral Management. |
| July 2016 | The Custody Services of Banks, by The Clearing House. |
| 2016 | Comments on selected decisions (Da. *Kommentarer til udvalgte afgørelser*), SKM2016.281.HR, RR.SM.2016.0101, by Anders Nørgaard Laursen. |
| February 2015 | Post Trade explained: The role of post-trade services in the financial sector, by Association for Financial Markets in Europe. |
| 2015 | European Banking and Financial Law, by Matthias Haentjens and Pierre de Gioia-Carabellese. |
| 2015 | Limited liability companies (Da. *Kapitalselskaber*), 8th edition, by Bern-hard Gomard and Peer Schaumburg-Müller. |
| 2015 | SKAT's early warning response in connection with stock lending (*Da.* Svar på early warning i forbindelse med aktielån), J.nr. 15-2051530. |

Moalem
Weitemeyer

| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| | |
|---|---|
| 2014 | IOSCO Final report – Recommendations Regarding the Protection of Client Assets |
| 2013 | Værdipapirhandelsloven med kommentarer 2013, 9th edition, by Jesper Lau Hansen. |
| 2013 | The Danish Securities Trading Act with commentaries, part II, 9th edition, by Jesper Lau Hansen. |
| 2013 | Limited liability companies (*Da.* Aktie- og anpartsselskabsret – Kapitalselskaber), 12th edition, by Paul Krüger Andersen. |
| 2013 | Grundlæggende aftaleret, by Mads Bryde Andersen. |
| 2012 | Almindelig kontraktret, Bernhard Gomard, Hans Viggo Godsk Pedersen & Anders Ørgaard. |
| 2012 | The Danish Companies Act with commentaries (*Da.* Selskabsloven med kommentarer), 1st edition, by Jan Schans Christensen. |
| 19 March 2012 | Post Trade Settlement Committee Task Force on CSD Account Structure: CSD Account Structure: Issues and Proposals, Final Report, by Association for Financial Markets in Europe. |
| 2012 | Aftaler og Mellemmænd, 6th edition, by Lennart Lynge Andersen and Palle Bo Madsen. |
| 2011 | Panterettens deklaratoriske omfang ved pant i kapitalandele, by Henrik Kure. |
| 2011 | Årsregnskabsloven med kommentarer, by Henrik Steffensen. |
| 2011 | Contract Law in Denmark, by Ruth Nielsen. |
| 2011 | Handbook of corporate equity derivatives and equity capital markets, by Juan Ramirez. |
| 2010 | The extent of the prohibition against short selling (*Da.* Rækkevidden af short selling-forbuddet), by Henrik Kure. |
| 2010 | On the rationale behind the prohibition against short selling (*Da.* Om rationalet bag forbud mod short selling), by Henrik Kure. |
| 2009 | Obligationsret 3. del, 2. edition, by Bernhard Gomard and edited by Torsten Iversen. |
| 2009 | Forvaltningsret – Almindelige emner, 5th edition, by Jens Garde et al. |
| 2009 | TfS.2009.480 by Jakob Bundgaard. |
| 2009 | Introduction to the law of property (Da. *Indledning til tingsretten – tredjemandskonflikter vedrørende løsøre*), 2nd edition, by Peter Mortensen. |
| 2008 | The Danish Sales of Goods Act with commentaries, by Jacob Nørager-Nielsen, Søren Theilgaard, Michael Bjerg Hansen and Martin Hørmann Pallesen. |

Report of : Mr. Henning Aasmul-Olsen
Specialist field : Danish Law
Retained by : Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen)
Prepared for : United States District Court, Southern District of New York

| | |
|---|---|
| 2007 | The Securities Custody, Occasional Paper Series, by the European Central Bank (Diana Chan, Florence Fontan, Simonetta Rosati, and Daniela Russo). |
| 2007 | Gældsbrevsloven med kommentarer, 2nd edition, by Lennart Lynge-Andersen, Peter Møgelvang-Hansen og Anders Ørgaard. |
| 2006 | The Danish Securities Trading Act with commentaries (*Da.* Værdipapirhan-delsloven med kommentarer), 1st edition, by Dan Moalem, David Moalem and Erik Werlauff. |
| 2006 | Tax law and civil law (*Da.* Skatteret og civilret), 1st edition, by Jakob Bund-gaard. |
| 2006 | Participation in limited liability companies – The shareholder concept in the light of company and tax law (Da. *Deltagelse i kapitalselskaber – ak-tionær-begrebet i selskabsretlig og skatteretlig belysning*), SPO.2006.17, by Jakob Bundgaard. |
| 2006 | Law of obligations (*Da.* Obligationsret), 4th edition, 1st part, by Bernhard Gomard. |
| 2004 | Legal methodology (*Da.* Juridisk Metodelære), 3rd edition, by Peter Blume. |
| 2004 | Securites' rights (*Da.* Rettigheder over værdipapirer. Individualisering og sik-ringsakt) in Juristen no. 4, by Ulrik Rammeskov Bang Pedersen. |
| 2003 | Sikkerhed i fordringer, 4th edition, by Nis Jul Clausen. |
| 2002 | Law & Methodology (*Da.* Ret & Metode), 1st edition, by Mads Bryde Ander-sen. |
| 1999 | The sources of law (*Da.* Rettens kilder), 1st edition, by Henrik Zahle. |
| 1999 | The law of Property 1 (*Da.* Ejendomsretten 1), 4th edition, by Michael Elmer and Lise Skovby. |
| 1997 | Actio Pauliana og pro forma (1997, published in Ugeskrift for Retsvæ-sen.1997B.369), by Torben Jensen. |
| 1992 | Juridisk grundbog 1 – Retskilderne, W.E. von Eyben. |
| 1978 | Aftaler, by Henry Ussing. |
| 1972 | Formuerettigheder: Indhold, beskyttelse, overdragelse, by W.E. von Eyben. |
| 1971 | Kontraktsret I, by Stig Jørgensen. |
| 1967 | Obligationsretten – Almindelig del, by Henry Ussing. |
| 1908 | Haandbog i Obligationsretten, almindelig del, by Julius Lassen. |

**Other materials**

| Date | Materials |
|---|---|

Moalem
Weitemeyer

Report of           :    Mr. Henning Aasmul-Olsen
Specialist field    :    Danish Law
Retained by         :    Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen)
Prepared for        :    United States District Court, Southern District of New York

| | |
|---|---|
| 2022 | CVR – Central Business Register – Database by The Danish Business Authority (Da. CVR – Det Centrale Virksomhedsregister - Erhvervsstyrelsen) https://datacvr.virk.dk/data/. |
| 27 April 2022 | Novo Nordisk A/S' articles of association. |
| February 2021 | Novo Nordisk' notice for annual general meeting 2021 |
| 4 December 2020 | Data extract from VP Securities. |
| 20 October 2020 | Indicator summary from VP Securities. |
| 3 September 2020 | Ringkjøbing Landbobank Custody Account Terms. |
| September 2020 | Jyske Bank Custody Account Terms. |
| 2020 | Annual Report – Novo Nordisk. |
| 2020 | Annual Report – Carlsberg. |
| 2020 | Annual Report – Danske Bank. |
| 1 June 2019 | Spar Nord Custody Account Terms. |
| 25 May 2018 | Nordea Custody Account Terms. |
| 1 March 2018 | Danske Bank Custody Account Terms. |
| 3 January 2018 | Saxo Bank Custody Account Terms. |
| 3 January 2018 | Arbejdernes Landsbank Custody Account Terms. |
| 3 January 2018 | Den Jyske Sparekasse Custody Account Terms |
| 3 January 2017 | Skandinaviska Enskilda Banken (SEB) Custody Account Terms. |
| 13 December 2017 | Nykredit Custody Account Terms. |
| 12 December 2017 | Vestjysk Bank Custody Account Terms. |
| 30 September 2013 | Danske Bank Custody Account Terms. |
| 24 September 2007 | Sydbank Custody Account Terms. |

**Submissions in the Dispute provided by Plaintiff**

| Date | Material |
|---|---|
| 29 April 2022 | Plaintiff Skatteforvaltningen's Memorandum of Law in Support of its Motion for Partial Summary Judgment. |
| 29 April 2022 | Defendants' and Third-Party Defendants' Memorandum in Support of Motion for Summary Judgment. |
| 28 April 2022 | Eastern High Court Ruling: Skatteforvaltningen v. Bech Bruun Advokatpartnerselskab P/S (case no. BS-26436/2020-OLR), including a certified English translation. Only the High Court's ruling and holdings have been made available to me. |
| 27 April 2022 | Declaration of Foreign Law of Kasper Bech Pilgaard in the Dispute. |

| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| | |
|---|---|
| 31 December 2021 | Expert Report of Bruce G. Dubinsky. |
| 7 December 2021 | Remote VTC videotaped deposition under oral examination of Helen Sorensen, Volume II. |
| 21 September 2021 | Remote VTC videotaped deposition under oral examination of Helen Sorensen. |
| 8 June 2021 | Remote VTC videotaped deposition under oral examination of Gunnar Volkers in the Dispute dated June 8, 2021. |
| 16 September 2019 | Rosenblatt Investigation into Danish trading activity of ED&F Man Professional Trading (Dubai) Ltd ("MPT Dubai") with no annexes or ancillary documents except for Annex E. |
| 2 October 2020 | Decision by Danish Tax Tribunal which involved the Riverside Associates Defined Benefit Plan. |
| 16 July 2020 | Decision by Danish Tax Tribunal which involved the FWC Capital LLC Pension Plan. |
| 16 July 2020 | Decision by Danish Tax Tribunal which involved the Roadcraft Technologies LLC Roth 401(K) Plan. |
| 7 July 2020 | Decision by Danish Tax Tribunal which involved the American Investment Group of New York, L.P. Pension Plan. |
| 26 June 2020 | Decision by Danish Tax Tribunal which involved the Proper Pacific LLC 401(K) Plan. |
| 19 December 2019 | Pleading of Defendants (The Proper Pacific LLC 401(K) Plan) in Danish tax cases before the Danish Tax Tribunal (Bellwether) prepared by TVC Advokatfirma, lawyers Kasper Bech Pilgaard and Torben Bagge. |
| 18 December 2019 | Pleading of Defendants (The FWC Capital LLC Plan) in Danish tax cases before the Danish Tax Tribunal (Bellwether) prepared by TVC Advokatfirma, lawyers Kasper Bech Pilgaard and Torben Bagge. |
| 9 December 2019 | Pleading of Defendants (Roadcraft Technologies LLC Roth 401(K) Plan) in Danish tax cases before the Danish Tax Tribunal (Bellwether) prepared by TVC Advokatfirma, lawyer Kasper Bech Pilgaard. |
| 27 August 2019 | Pleading of Defendants (Roadcraft Technologies LLC Roth 401(K) Plan) in Danish tax cases before the Danish Tax Tribunal (Bellwether) prepared by TVC Advokatfirma, lawyer Kasper Bech Pilgaard. |
| 12 August 2019 | Pleading of Plaintiff (Skatteforvaltningen) in Danish tax cases before the Danish Tax Tribunal (the FWC Capital LLC Plan case). |

| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

14 May 2019      Pleading of Defendants (The FWC Capital LLC Plan) in Danish tax cases before the Danish Tax Tribunal (Bellwether) prepared by TVC Advokatfirma, lawyers Kasper Bech Pilgard and Torben Bagge.

7 May 2019      Pleading of Defendants (Roadcraft Technologies LLC Roth 401(K) Plan) in Danish tax cases before the Danish Tax Tribunal (Bellwether) prepared by TVC Advokatfirma, lawyer Kasper Bech Pilgaard.

20 November 2018      Pleading of Defendants (The FWC Capital LLC Plan) in Danish tax cases before the Danish Tax Tribunal (Bellwether) prepared by TVC Advokatfirma, lawyers Kasper Bech Pilgaard and Torben Bagge.

| Report of | : | Mr. Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

**Appendix 4 - Timeline for dividend distribution based on T+2 and T+3 settlement**



| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

**Appendix 5 – Cases referenced by Mr. Pilgaard**

| Reference | Description |
|---|---|
| SKM2001.126.HR | K1, K2, K3 and F1 incorporated on 1 July 1990 F2. On 1 September 1994, K3 sold nominally DKK 10,000 shares in F2 to K1 and DKK 12,000 shares in F2 to K2. Simultaneously, F1 sold all of its shares, nominally DKK 24,000 in F2 to K1. All shares were sold at a price of DKK 0. All trades were completed and there was no issue or dispute regarding whether (i) the shares existed, (ii) a final and binding agreement had been concluded, and (iii) the shares had been delivered and at what time delivery occurred. The Supreme Court held that the Danish Capital Gains Tax Act's rules on timing for passing of title for tax purposes is the time of transfer. As K1, K2, and K3 had executed trade confirmations on 1 September 1994, the Supreme Court held that the point in time from which taxation should occur was 1 September 1994. |
| | |
| SKM2005.490.HR | In May 1999, A and C entered into an agreement with B. The agreement provided B with a right to acquire A and C's shares in company D in the period between 1 August 2001 and 30 April 2002. B exercised the call option in January 2002. The trade was completed and there was no issue or dispute regarding whether (i) the shares existed, (ii) a final and binding agreement had been concluded, and (iii) the shares had been delivered and at what time delivery occurred. The Supreme Court held that the shares from a tax law perspective were sold at the time of conclusion of the option agreement in May 1999 and not at the time of exercise, as the Supreme Court found it highly unlikely that the option would not have been exercised as contemplated. Consequently, the Supreme Court held that the point in time from which taxation should occur was 1 September 1994. |
| | |
| SKM2011.533HR | On 30 June 2000, A entered into an agreement with B. The agreement provided B with a right to acquire A's shares in company C. B exercised the option in December 2001. The trade was completed and there was no issue or dispute regarding whether (i) the shares existed, (ii) a final and binding agreement had been concluded, and (iii) the shares had been delivered and at what time delivery occurred. The Supreme Court held that the shares from a tax law perspective were sold at the time of conclusion of the option agreement in June 2000 and not at the time of exercise, as the Supreme Court found it highly unlikely that the option would not have been exercised as contemplated. Consequently, the Supreme Court held that the point in time from which taxation should occur was 30 June 2000. |
| | |

## Moalem
## Weitemeyer

| Report of | : | Mr. Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

| | |
|---|---|
| SKM2008.825BR | On 16 December 2000, VN faxed to A an offer to purchase A's shares in company C. The shares were identified by physical share certificates and held in custody by Credit Suisse. There was no issue or dispute regarding whether (i) the shares existed, (ii) a final and binding agreement had been concluded, and (iii) the shares had been delivered. The time of delivery of the shares was unclear, but the City Court held that the shares were delivered at the time Credit Suisse's issuance of a "Transfer Instruction for Securities" on 27 February 2001 which stated that the share certificates should be sent to VN by registered letter. The Supreme Court held that the shares from a tax law perspective were sold at the time of conclusion of the agreement in December 2000. Consequently, the Supreme Court held that the point in time from which taxation should occur was 16 December 2000. |
| | |
| SKM2010.259.BR | On 28 February 2003, A entered into an agreement to sell shares in H2 to B. The shares were to be delivered and the consideration was to be paid within one year from 28 February 2003. The consideration could be paid by B in either cash or shares in B. B had the right to determine the time and form of payment of consideration and delivery within this period. B chose to pay in shares. The trade was completed at the expiry of the one year period. Shortly after, A sold the shares in B. The question concerned the timing of taxation with respect to the shares in B acquired by A. There was no issue or dispute regarding whether (i) the shares existed, (ii) a final and binding agreement had been concluded, and (iii) the shares had been delivered and at what time delivery occurred. Primarily because A had the downside risk on the shares in B from the time of entering into the agreement on 28 February 2003, the City Court held that the shares for taxation timing purposes had been sold at the time of the conclusion of the agreement on 28 February 2003 and that taxation should occur from this time. |
| | |
| SKM2002.399.VLR | A had a put option on the shares, which he exercised in 1995. However, the exercise was not immediately executed due to certain issues, including terms of placing the purchase price into escrow. The High Court held that the shares were not sold until 1996, where the transfer was executed. There was no issue or dispute regarding whether (i) the shares existed, (ii) a final and binding agreement had been concluded, and (iii) the shares had been delivered and at what time delivery occurred. |
| | |
| SKM2008.759.SR<br><br>(advance tax ruling (*Da.* bindende forhåndssvar) | An option agreement contained a call and put option for the shares in company A. The Danish Tax Assessment Council (*Da.* Skatterådet) was asked to confirm that the entry into of the option agreement would not trigger taxation at such time, i.e. the Danish Tax Assessment Council was not |

| Report of | : | Mr. Henning Aasmul-Olsen |
|---|---|---|
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

|  |  |
|---|---|
|  | asked to opine on whether (i) the shares existed, (ii) a final and binding agreement would have been concluded, and (iii) the shares could be delivered and at what time delivery would have occurred. The Danish Tax Assessment Council stated that in the specific case it could not be considered a certainty that the option would be exercised, and that there was nothing in the information provided which indicated that the option agreement should in fact be a sale and purchase agreement. The Danish Tax Assessment Council held that there was a real possibility that the option would not be exercised. The transfer of the shares from a tax law perspective would therefore be deemed to have taken place at the time of exercise of the option from which time the transfer would be subject to taxation. |
|  |  |
| SKM2008.803.SR<br><br>(advance tax ruling (*Da.* bindende forhåndssvar) | The Danish Tax Assessment Council was asked to confirm that a final and binding agreement on the acquisition of shares for tax law purposes would at the earliest be deemed entered into when certain specific conditions had been met, i.e. the Danish Tax Assessment Council was not asked to opine on whether (i) the shares existed, and (ii) the shares could be delivered and at what time delivery would have occurred. As the conditions to the agreement had suspensory effect, meaning that the condition entailed that actual uncertainty existed as to whether the agreement will be concluded, the Danish Tax Assessment Council confirmed the request. |
|  |  |
| SKM2008.831.SR<br><br>(advance tax ruling (*Da.* bindende forhåndssvar) | The Danish Tax Assessment Council was asked to confirm whether shares for which an order was placed for prior to 30 December 2005 was subject to the Danish Capital Gains Taxation Act, i.e. the Danish Tax Assessment Council was not asked to opine on whether (i) the shares existed, and (ii) the shares could be delivered and at what time delivery would have occurred. As part of its analysis, the Danish Tax Assessment Council stated that according to customary tax law rules, a share purchase is considered for tax law purposes to have taken place at the time of entry into of a final and binding agreement. The Danish Tax Assessment Council held that the placing of an order for shares cannot be considered a final purchase agreement and consequently that the shares in question was not subject to the Danish Capital Gains Taxation Act. |
|  |  |



| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

**Appendix 6 – Collection of statements by legal commentators on segregation as a condition for ownership**

**Henry Ussing** (1967)[84],  has stated:

"Genus purchases are purchases where the asset sold is determined by type. Here, the seller undertakes to deliver one or more assets of a type determined by the agreement. *In this case, the purchaser does not immediately at the conclusion of the agreement acquire property rights to specific assets*, and the seller can perform the agreement by delivering any assets that belong to the type agreed." (my translation and emphasis)

Further, the same **Henry Ussing** (1978)[85] has stated:

"Personally binding promises are in this context understood to be promises that *do not immediately affect any specific property right* but create a claim for a performance. This applies to promises for personal work services, for non-performance and for *generically determined assets*, including promises for payment of money." (my translation and emphasis)

**Peter Mortensen** (2008)[86] has stated:

"If the promise concerns an unspecified product – i.e., delivery of a bunch of products of a certain type (generic) or payment of money – the promise is not a transfer of ownership. The promise instead creates a claim for the product (the bunch of items or the money) but it does not concern any specific property (e.g., real estate, chattel, a loan note), which is why the promise cannot be said to transfer ownership to any property to the recipient of the promise. If the person making the promise does not honour such promise, the recipient cannot claim delivery of specific items, but is left to seek enforcement (e.g., an attachment) of the promise against assets in general. *Only upon binding segregation of the product – i.e., segregation and labelling of certain items for performance of the promise – will the ownership to the segregated items be transferred to the recipient*." (my translation and emphasis)

**Lars Henrik Gam Madsen** (2018)[87] states:

"A property right is characterized by the fact that it is aimed at an individually determined asset. *A right which is not linked to a segregated asset lacks the necessary property right aspect and is thus exclusively a claim (a personal right) against the obligee personally*."[88] (my translation and emphasis)

---

84 See Henry Ussing: *Køb* (*En. Purchases*), 4th ed. (1967), page 10.
85 See Henry Ussing: *Aftaler* (*En. Agreements*), 3rd ed. (1978), page 11.
86 See Peter Mortensen: *Indledning til tingsretten* (*En. Introduction to the law of property*), 2nd ed. (2009), pages 83.
87 Lars Henrik Gam Madsen: *Festskrift til Mads Bryde Andersen* (*En. Festschrift to Mads Bryde Andersen*) (2018), page 603.
88 Ibid page 594 Lars Henrik Gam Madsen has explained that the subject of the article is to show that the relevant criteria for having a property right is whether the asset has been segregated *inter partes*. See also, ibid., pages 606-607.



| | | |
|---|---|---|
| Report of | : | Mr. Henning Aasmul-Olsen |
| Specialist field | : | Danish Law |
| Retained by | : | Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) |
| Prepared for | : | United States District Court, Southern District of New York |

Further, **Lars Henrik Gam Madsen** (2020)[89] states the following in discussing the nature of a pledge:

> "*If the asset pledged is not segregated, the pledgee does not have a property right over a* certain *asset (or a certain limited amount of assets), but only a claim against the pledgor that pledge must be provided.*" (my translation and emphasis)

**Torsten Iversen** (2019)[90] states:

> "A transfer of the right to an asset or a right can come about in several ways. In some cases, the acquiror can obtain the right immediately upon conclusion of the contract or the creation of a work to be produced for him. In other cases, the acquiror will not acquire the right until segregation of assets to perform the contract or upon delivery of the asset. The purchase of specific assets is an example of a contract that contains a transfer undertaking or a transfer so that the transferor's promise immediately transfers the right over the thing (the asset sold) to the transferee. *Other contracts, such as a generic purchase with delivery after the conclusion of the agreement, do not imply an undertaking that is effective immediately to transfer the property right, but only a personally binding promise. In the case of a generic purchase, a transfer, which gives the acquiror the right to specific assets does not take place until the debtor performs the contract at the due date by a delivery that meets the requirements of the contract.*" (my translation and emphasis)

---

[89] Lars Henrik Gam Madsen: *Virksomhedspant, fordringspant og pantsætningsforbud* (*En. Floating charge, receivables charge and prohibition of pledging*) (2020), pages 193-194.
[90] Torsten Iversen: *Obligationsret I* (*En. Law of obligations part 1*), 6th (2019), page 353.